**CATTLE RAISERS' LOAN CO. et al. v. SUTTON. (No. 7249.)**

(Court of Civil Appeals of Texas. San Antonio. March 4, 1925.)

1. **Joint-stock companies and business trusts ⊖6—Evidence held to warrant finding purchase of shares in trust association was obtained by fraud.**

In action to rescind purchase of shares in common-law trust association on ground of fraud and for damages, evidence held to warrant verdict for plaintiff.

2. **Joint-stock companies and business trusts ⊖22—Corporation taking over assets of common-law trust association held liable for association's liabilities to extent of property received.**

Corporation which took over assets of common-law trust association without consideration, except agreement to issue stock therefor, with notice of facts, was not innocent purchaser in good faith and for value, and was liable for all obligations and fraud of association, at least to extent of property received, even if it had no knowledge of fraud.

3. **Joint-stock companies and business trusts ⊖6—Giving of proxies alone does not waive stockholder's right to rescind purchase of stock for fraud nor create estoppel, unless he had notice of facts.**

Giving of proxies alone does not waive stockholder's right to rescind purchase of stock on ground of fraud nor does it constitute estoppel, unless he had full knowledge of facts.

4. **Fraud ⊖22(1)—Person procuring contract cannot assert inquiry would have disclosed facts.**

Person, whose fraudulent misrepresentations induced contract, cannot assert that plaintiff might have known truth, if he had made further inquiry.

5. **Joint-stock companies and business trusts ⊖16—Stockholder present by proxy, who declines to vote or votes against question, held not bound.**

Stockholder present by proxy, who declines to vote on action urged, or votes against it, cannot be held to have assented thereto, and is not bound thereby on theory of waiver or estoppel.

6. **Estoppel ⊖116—Burden on corporation to show that proxy of stockholder seeking to rescind purchase of stock for fraud was voted.**

Burden is on corporation, asserting waiver or estoppel arising from stockholder's giving of proxy, to show that proxy was voted.

**7. Fraud ⊜38—Delay by defrauded party does not waive fraud.**

Delay by defrauded party does not waive fraud, but his right of action is lost by statute of limitations.

**8. Joint-stock companies and business trusts ⊜22—Corporation taking over assets of common-law trust association held not liable for commissions for soliciting subscriptions paid by common-law trust.**

Corporation, which took over assets of common-law trust association without consideration, was not liable for commissions paid for subscriptions to association to shareholder, who sued to rescind his purchase for fraud, notwithstanding representation that there would be no charge for commissions.

**9. Corporations ⊜80(12)—Rule as to right of defrauded stockholder seeking to rescind purchase of stock stated.**

Rights of stockholder, who seeks to rescind purchase of stock in going concern for fraud, become those of creditor superior to other stockholders who prefer to remain in corporation, but this is not so where corporation is in process of liquidation, and other stockholders are equally defrauded.

**10. Evidence ⊜434(8)—Parol evidence admissible to contradict fraudulent written contract.**

Parol evidence is admissible to contradict fraudulent written contract, regardless of whether fraudulent representations were present, prospective, or promissory or relate to present or future matters.

**11. Evidence ⊜434(8)—Parol evidence admissible to show fraud in procuring subscriptions to common-law trust association.**

Parol evidence is admissible to show fraud in procuring subscriptions to common-law trust association, notwithstanding terms of trust provided that no agreements, other than those contained in application and in company's literature, should be binding on either party.

**12. Evidence ⊜546—Whether witness qualified to testify as expert usually left to court's discretion.**

Whether witness is qualified as expert is usually left to court's discretion; if he has some qualifications he should be permitted to testify, extent of qualifications going to weight of testimony rather than to its admissibility.

**13. Evidence ⊜525—Witness who qualified as expert was properly permitted to testify as to value of corporate stock.**

In action to rescind purchase of stock for fraud, witness, who qualified as expert, was properly permitted to testify as to value of stock.

**14. Principal and agent ⊜188—Agent, who knowingly participates and assists in perpetration of fraud, may be joined as defendant.**

Agent, who knowingly participates and assists in perpetration of fraud, may be joined as defendant.

**15. Joint-stock companies and business trusts ⊜6—Promoter and sole trustee of common-law trust association and agent, who solicited subscriptions, held not necessary parties to stockholder's action to rescind purchase for fraud.**

Promoter and sole trustee, and agent who solicited subscriptions to common-law trust association, who had parted with all interest in trust estate by transferring trust assets to defendant corporation, which assumed trustee's obligations and guaranteed him against loss, were not necessary parties in stockholder's action to rescind purchase of stock for fraud.

**16. Joint-stock companies and business trusts ⊜1—Distinction between common-law trust associations deemed to be "partnerships" and those deemed pure "trusts" stated.**

Common-law trust associations used to carry on business are those in which interested parties have some management and control which are deemed to be partnerships, and those in which trustees have sole control as principals, which are true trusts; test being amount of control retained by beneficiaries.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Partnership; Trust.]

**17. Joint-stock companies and business trusts ⊜1—Declaration of trust creating loan held to create pure trust and not partnership.**

Declaration of trust creating stock raisers' loan company giving sole trustee power to manage, control, and organize another corporation to purchase and take over trust assets and to convey trust property to it held to create pure trust, and not partnership.

**18. Common law ⊜12—Common law in effect in Texas, except where inconsistent with Constitution and laws.**

Common law is in effect in Texas, except where it is inconsistent with Constitution and laws.

**19. Joint-stock companies and business trusts ⊜1—Common-law trust associations valid in Texas.**

Common-law trust associations and rights of trustee to act for them are valid in Texas.

Appeal from District Court, Lasalle County; J. F. Mullally, Judge.

Action by R. C. Sutton against the Cattle Raisers' Loan Company and others. Judgment for plaintiff and defendants appeal. Judgment as to defendant Fanning reversed and rendered. As to defendant Cattle Raisers' Loan Company, judgment is reversed and remanded, unless plaintiff consents to remittitur, in which event it is affirmed.

Dayton Moses and S. C. Rowe, both of Fort Worth, and Taliaferro, Cunningham & Moursund, of San Antonio, for appellants.

Willson & Cooper, of Cotulla, and Arnold & Cozby, of San Antonio, for appellee.

---

⊜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

COBBS, J. Appellee, R. C. Sutton, brought this suit against Cattle Raisers' Loan Company, a corporation of Fort Worth, Tex., and S. H. Fanning of Dallas, Tex., seeking to recover $10,000, as damages alleged to have been sustained by him by reason of the purchase by him of stock of the par value of $10,000 in a company organized and operating under a declaration of trust, known as Stock Raisers' Loan Company. The plaintiff's petition contained 74 specific averments of fraudulent representations alleged to have been made to him, besides a few other more general charges, one of which was the Stock Raisers' Loan Company, unincorporated, "was not organized for the purpose of financing stock raisers, but was organized and promulgated as a fraudulent stock selling scheme and conspiracy on the part of said Vernor, under a declaration of trust executed by him alone, wherein he was named sole trustee, with full authority and power of every kind, and control of the assets as fully and conclusively as if he was absolute owner."

The theories presented in plaintiff's petition, by which he sought to fix liability upon Cattle Raisers' Loan Company for the alleged fraud of Fanning and Stock Raisers' Loan Company (the trust concern), were briefly stated as follows: (1) That Fanning and the Stock Raisers' Loan Company were promoters of the common-law trust company who assigned to appellant, a corporation organized under the laws of Delaware under the name of Stock Raisers' Loan Company, and its corporate name afterwards changed to Cattle Raisers' Loan Company. (2) That the copartnership, or common-law trust, was operated under the name of Stock Raisers' Loan Company, organized by J. C. Vernor as sole trustee, who transferred and delivered to the appellant corporation all the assets of the said copartnership, or common-law trust, which went out of existence, and Vernor was no longer thereafter connected with the enterprise; that the appellant corporation paid nothing for the assets, only issued its capital stock therefor, of which the corporation had notice at the time it took over such assets and equities of the plaintiff. (3) That the defendant corporation expressly, or impliedly, assumed the liabilities of the unincorporated company, and was charged therewith. (4) That the defendant corporation is the Stock Raisers' Loan Company in an incorporated form, and is the same organization, and the same business, as the copartnership or common-law trust, which it was alleged had ceased to exist. (5) That the assets so transferred constituted a trust fund charged with the liability to plaintiff, and that the assets largely exceeded the indebtedness claimed by plaintiff.

The plaintiff prayed for rescission of his contract with the trust estate, and for judgment against the defendants jointly and severally for $10,000, with interest thereon from the date he parted with his consideration, and the establishment of a lien in his favor on the assets acquired by the corporation from the unincorporated concern, and, in the alternative, he asked for damages.

The appellants, in addition to general demurrers and general denials, specifically denied that it, or any agent or representative, had made any representation to the plaintiff concerning any sale of stock, or had entered into any agreement with him of that nature. It then alleged that it believed the fact to be, that plaintiff and divers other persons had purchased interests in and become members of, and shareholders in, a trust estate, organized by J. C. Vernor, about February 3, 1920, who was residing in the city of Dallas; that said trust estate was created under a declaration of trust by said Vernor, a copy of which was attached to the answer and made part of it. It was in the usual form of a Massachusetts common-law trust, providing for various purposes, among which was the making of cattle loans and specifying that Vernor and the trustee was to receive 39 per cent. of the first money paid in on all stock subscriptions to cover the expense of organization. The defendant also pleaded that Sutton purchased his stock by written applications, each of which contained a reference to the declaration of trust on file in the office of the company at Dallas, as a complement to such application, and each of which contained a stipulation that no conditions or agreements, either written or verbal, other than those contained in the application and the company's literature, should be binding on either party thereto.

The defendant corporation further pleaded that the plaintiff made no inquiry concerning the terms of this declaration of trust, and did nothing to show a desire for such information; and that, by reason of the provision in the application and other matters alleged by it, plaintiff was estopped from claiming that he did not know the terms and conditions of the declaration of trust, and that same were withheld from him. Defendant further alleged that if any fraud was practiced upon plaintiff, it was done by J. C. Vernor, the trustee, duly authorized by the plaintiff to act for him under the terms of the declaration of trust and the agents and representatives of said Vernor. The defendant corporation then alleged its incorporation on June 21, 1920, under the laws of Delaware, and that thereafter Vernor as trustee, acting under the power provided in the declaration of trust, and with the consent of plaintiff and the other shareholders, sold, assigned, and transferred to the defendant corporation all of the assets held by him as trustee, in consideration for the issuance to him by the corporation of 169,-

181⅓ shares of its capital stock, to be evidenced by certificate issued to Vernor, trustee. The defendant then alleged the particular provisions of the transfer.

The said defendant further alleged the issuance to plaintiff of a certificate of stock out of the stock transferred to said Vernor, covering the shares of stock subscribed for by plaintiff in the trust estate; and then further alleges various facts relied upon to show notice and knowledge on the part of plaintiff of the matters complained of by him, and the facts relating to the issuance of certificates of stock to plaintiff in the corporation, the voting of proxies given to him, and the reissuance of stock to him at the time the name of the corporation was changed and the capital stock reduced from $2,000,000 to $400,000. The allegations are too lengthy to be copied here. In connection with the same, and based thereon as alleged, said defendant alleged acquiescence, affirmance, ratification, and confirmation by the plaintiff of his said purchases of stock, and estoppel from setting up or claiming that he had been defrauded. The appellant Fanning adopted the pleadings of the corporation.

The case was tried with a jury upon ten special issues, and all of them were answered favorably to the plaintiff. Judgment was rendered on March 12, 1924, in favor of plaintiff, against both defendants, for the sum of $12,101.30, together with 6 per cent. interest from March 14, 1924, until paid. The judgment recites that it is one of rescission, and requires that the 1,000 shares of stock in the name of Sutton be annulled. It further adjudges an equitable lien in favor of plaintiff in and to all assets obtained by the corporation from the common-law trust known as Stock Raisers' Loan Company, and the proceeds of such assets, and grants a foreclosure of such lien. Then follows a recitation in the judgment, as follows:

"The court, from the undisputed evidence, finds that the plaintiff in purchasing the stock parted with a consideration of the value of $10,000, and that the stock purchased would have been worth such consideration had the representations made to the plaintiff, and which the jury found were false, been true. In response to issue or question No. 11 the jury found that the reasonable value of the stock purchased by the plaintiff in the Stock Raisers' Loan Company, unincorporated, at the time it was purchased was $3,400. These findings and recitations are inserted in this decree so that the appellate court, if this case is appealed, may apply the proper remedy in the event for any reason the remedy of rescission should not be proper remedy to which the plaintiff is entitled."

Briefly stated, J. C. Vernor, the trustee, conceiving a get rich quick scheme, on February 3, 1920, organized one of those so-called Massachusetts common-law trusts, and named it "Stock Raisers' Loan Company," a name to jingle pleasantly to cattle raisers and stockmen. While it has been said "there is nothing in a name" this promoter knew better. He knew his business and fished for and netted such stockmen as appellee. The trust that Vernor organized especially exempted Vernor from individual liability from anything he might promise, do, or say. The title to all the assets and the estate of the trust company was vested in Vernor, who could use or transfer a part or the whole of the estate at any time, free from the claims of any one, and he was accountable for his acts to no one. For his services in promoting the scheme he was to be paid 39 per cent. of the first money paid in on all stock subscriptions. He knew that under the laws of Texas he could receive no such promoter's fees, and hence this flexible trust scheme was promulgated, intending thereafter to escape the obligations of his trust company by merging it in a corporation created under some law. The twenty-first article of the trust agreement provided for just such a procedure, in the following words:

"At any time during the continuation of this trust, the said trustee may incorporate the same or any part thereof, for any one, two, more, or all of the purposes herein provided for, under the laws of any state or the United States, or transfer the property, or any part thereof held by him, to an existing corporation; if, in his discretion and judgment, he deems it so advisable."

Appellant corporation was organized, and on June 20, 1920, filed its certificate of incorporation of Stock Raisers' Loan Company, with the secretary of state of Delaware. On October 4, 1922, there was filed a certificate of reduction of capital stock, which had been executed on September 26, 1922. The authorized capital was reduced to $400,000, and it was provided that shares of $10 each should be surrendered, and same number of new shares at $4 each issued in lieu thereof. The directors' names are signed thereto, but neither Vernor's nor Fanning's name appears in the list. At the same meeting of stockholders held September 26, 1922, the charter was also amended so as to change the name of the corporation to Cattle Raisers' Loan Company.

Appellee, a ranchman, lived in Cotulla, and the common-law trust was organized in the spring of 1920, by J. C. Vernor, with the home office in Dallas, Tex. Mr. Vernor, the promoter of the common-law trust, sent out S. H. Fanning to secure stock subscriptions. Its alleged capital stock was $2,000,000. It had no assets when it began its campaign, except in its belief of human weakness, and that it would find many good men with faith and money. It will be seen that this mode of venture was adopted, because under the wise provisions of Texas laws, no stock could be issued unless a per cent. there-

of be paid in cash, for no such sums as were paid him for organization would be recognized. But this wise promoter provided a way to organize a corporation after selling its stock.

To put this over it was necessary, of course, that the organization should show responsible men at its head; so the names of the officers of the common-law trust are shown in the literature of the common-law trust, which literature recommends the officers highly. According to the literature, their names are: L. E. Bumpass, president; W. B. McShan, vice president; M. J. Norrell, secretary; P. D. Harris, treasurer; Jed C. Adams, attorney; and John Dyer, inspector, but nowhere upon the literature could be found the name of J. C. Vernor, the trustee. However the names of the board of officers appointed by J. C. Vernor were very prominently advertised. The above-named officers are also shown on the letter heads of the common-law trust.

When the stock selling campaign was over, the assets available were less than $500,000, and the commissions which had been taken and retained by Mr. Vernor, the trustee, for organizing the common-law trust, were more than $500,000. Over half of the proceeds of stock sales were diverted for commissions. All that was left of the proceeds was turned over to a Delaware corporation, and later the name was changed to Cattle Raisers' Loan, Company, appellant herein. This corporation was organized by all the officers of the common-law trust, appointed by Vernor. But Vernor's name does not appear as an officer of the Delaware corporation. The appellant corporation did not pay one single dollar for the assets of the common-law trust.

Powell D. Harris, who was treasurer for Vernor for four months, and at the time he testified secretary and treasurer of the corporation, was the only witness who was interrogated concerning the sale by the common-law trust to the corporation. He testified for appellee by deposition, as follows:

"I know nothing concerning the books and records of the unincorporated Stock Raisers' Loan Company, as I had nothing to do with them, and I do not know where those books are at the present time, or in whose custody. I presume, however, and it is my understanding, that Vernor took them with him, at least they were not turned over to the corporation or its officers."

Answering the question as to what assets were received by the Stock Raisers' Loan Company, a corporation, from the trust estate of J. C. Vernor, known as the "Stock Raisers' Loan Company," witness replied as follows.

"I give here the following as the assets, as shown by our records:

| | |
|---|---|
| Cash on hand and on deposit | $167,476 66 |
| Funds represented by certificates of deposit | 72,456 73 |
| Liberty Bonds | 36,050 00 |
| Money loaned (after paid to the corporation) | 440 00 |
| | $277,423 39 |
| Stock 50 shares Cattlemen's Trust Co., Fort Worth, Texas | 500 00 |
| Cash received from subscribers to shares of stock in the trust estate, whose obligations were transferred to the corporation by Vernor, amounted to | 216,095 78 |
| Making a total of cash assets finally coming into the hands of the corporation | $493,519 17 |

"Furniture and fixtures received were carried on the books at $822.13."

The common-law trust company never had any intention to do any business, nor to engage in the cattle loan business. Vernor's obvious purpose was to organize it, receive his money, and turn it over to such a corporation as his charter provided for. The appellant corporation paid no money to the common-law trust, but bound itself to protect and indemnify Vernor in the following language:

"As a further consideration of this conveyance, the said Stock Raisers' Loan Company, a corporation, agrees to indemnify and hold harmless the said J. C. Vernor against any and all losses, liabilities, claims, damages, and judgments which may be asserted against or collected from said J. C. Vernor on account of his trusteeship under the declaration of trust hereinabove referred to, or on account of his having executed this conveyance and contract."

Thus Vernor stripped his trust company completely. The transfer provided, among other things, as follows:

"Now, therefore, the said J. C. Vernor, trustee, hereby and herewith sells, conveys, assigns, and transfers to the Stock Raisers' Loan Company, a Delaware corporation, all of the assets held by him as such trustee under said agreement and declaration of trust, a complete list of which assets is hereto attached and is evidenced by Exhibits A, B, C, D, E, and F. This conveyance is to include all the good will, advertising, and every benefit and advantage held by said trustee.

"This conveyance is made by said J. C. Vernor, trustee, for 169,181⅓ shares of the capital stock of the Stock Raisers' Loan Company, a corporation, for which there shall be issued a certificate or certificates which are to be indorsed by J. C. Vernor and placed in escrow with L. E. Bumpass who is to hold the same for the purpose of having reissued against such certificate or certificates held in escrow certificates amounting to 29,202 shares to such persons and for such number of shares as are shown on Exhibit C hereto attached.

"There shall be issued against such certificate or certificates held in escrow further certificates by the Stock Raisers' Loan Company from time to time, to such persons and for such number of shares as they may be entitled to receive under the terms of the dec-

laration of trust and the purchase agreements and which are listed in Exhibits D and E."

It also undertook "to pay over to J. C. Vernor, or his order, any and all moneys collected and which are due to said Vernor * * * on agreements to purchase."

Appellant received the assets of the trust company, amounting to $493,519.17. It paid no cash for the same, nor acquired assets from any other source at the time. It did agree to issue shares of its capital stock to the stockholders in the common-law trust in lieu of shares therein held by its stockholders; and did so issue to appellee his pro rata share. Appellee sent proxies to vote his stock and never attended a meeting in person, nor does he know whether or not any proxies were voted. He never knew that Vernor took 39 per cent. of all stock sales. He understood from the agent that no charge would be made for such services to come out of his subscription. The first information of any fraud came to him through Judge Covey C. Thomas. He never read the declaration of trust. It was not shown to him, and he relied on the literature furnished him, together with the verbal statements made to him. At the time of the purchase of the stock by appellee, it was represented to him that the trust company started out with $2,000,000 in its treasury, and he did not know the falsity thereof, nor the falsity of any of the other representations until the summer of 1923, just before he filed this suit.

The first contention of appellant, if we understand it, (a) questions the sufficiency of the evidence to support a judgment, because it all relates to evidence other than that passed on by the jury, who find no fraudulent acts or words on the part of appellant corporation; (b) nor any findings of fact to connect appellant therewith or make it responsible; (c) and if responsible must be shown by undisputed (?) evidence that appellant is liable for the wrongful acts charged against Fanning and his employer.

[1, 2] We think there was ample evidence to support the findings of the jury. The appellant corporation was not in existence when the fraudulent sale and delivery was made, yet it is quite apparent that Vernor, the trustee, was the common-law trust, for it had no other existence than the life Vernor breathed into it, which was to catch subscribers, get their money, pay himself large sums of money, transfer to another assetless corporation, and get from under his legal obligation, then fly to other fields of adventure, leaving appellant company who took the property with full notice of all the facts that none of the stockholders should be held personally liable for any of its debts, but must look to the assets of the trust fund for protection. So, then, appellant took those assets with full notice of all the facts, burdened with all obligations to discharge the trust obligation out of the assets it took over, just as the trust company was obligated to do. Appellant cannot avert the disaster coming to it by saying it was an innocent purchaser, in good faith, for value, because it took over with it all the officers and managers of the common-law trust, who are operating the corporation. It is the same trust company under a new name, who has turned the old garment right side out and put it back on again, charged with knowledge of all the circumstances by which this stock was sold to appellee. The same officers who operated the trust company in the beginning, and at the time of the original sale of stock, are now operating the appellant corporation, without physical change, and in pursuance thereof collected from appellee, on the subscription contract, $5,000. In other words, of the $10,000 subscribed by appellee he paid $5,000 in cash, and the remaining $5,000 appellant collected later, after the trust company had transferred to it the contract of subscription.

As appellant company was organized to receive the assets of the common-law trust company and did take it, without paying $1 in consideration therefor, except an agreement to issue stock therefor in the new corporation, appellant became liable and bound for the obligations of the old common-law trust company, at least to the extent of the property it received, which it has absorbed like Jonah was swallowed by the big fish. Modern Dairy v. Blanke (Tex. Civ. App.) 116 S. W. 153; Texas Seed Co. v. Floral Co. (Tex. Civ. App.) 187 S. W. 747; Grice v. Am. Ry. Express (Tex. Civ. App.) 248 S. W. 82; Strahm v. Fraser, 32 Cal. App. 447, 163 P. 680; Peters v. Am. Ry. Express (Mo. App.) 256 S. W. 100; Am. Ry. Express v. Commonwealth, 190 Ky. 636, 228 S. W. 433, 30 A. L. R. 543; Arlington Hotel Co. v. Rector, 124 Ark. 90, 186 S. W. 623; Sweeney v. Heap, etc., Mining Co., 194 Mo. App. 140, 186 S. W. 739; Lincoln Safe Co. v. Continental, 213 Mo. App. 561, 249 S. W. 679; Meeks v. Arkansas Light Co., 147 Ark. 232, 227 S. W. 405; Northwest, etc., Tire Co. v. Perfection, 125 Wash. 84, 215 P. 360; Spring Creek Co. v. Dillman, 90 Okl. 129, 215 P. 1053; Valley Bank v. Malcolm, 23 Ariz. 395, 204 P. 208; Stanford Hotel Co. v. Schwind, 180 Cal. 348, 181 P. 780; Burkholder v. Okmulgee, 82 Okl. 80, 196 P. 679; Couse v. Columbia Co. (N. J. Ch.) 33 A. 297; Atlantic & B. Ry. Co. v. Johnson, 127 Ga. 392, 56 S. E. 482, 11 L. R. A. (N. S.) 1119; Evans v. Unity Inv. Co. (Mo. App.) 196 S. W. 51; Kentucky Beaver Co. v. Mellon, 200 Ky. 198, 254 S. W. 421; Auglaize Box Co. v. Hinton, 100 Ohio St. 505, 126 N. E. 881; Blanc v. Paymaster, 95 Cal. 524, 30 P. 765, 29 Am. St. Rep. 149; Taylor v. Gulf Land Co., 119 La. 426, 44 So. 187; Douglas Printing Co. v. Over, 69 Neb. 320, 95 N. W. 656; Wesco Supply Co. v. El Dorado, 107 Ark. 424, 155 S. W. 518; Ferguson v. Good, 112 Ark. 260,

165 S. W. 628; Jennings v. Crystal, 128 Tenn. 231, 159 S. W. 1088, 47 L. R. A. (N. S.) 1058; Corpus Juris, vol. 14, p. 305.

The total amount of assets taken over by appellant was $493,519.17, so appellant cannot keep the fruits or benefits of the fraud of the promoter company and escape its liability. · If it keeps the fruits of the fraud of the common-law trust company, with knowledge of the fraud perpetrated, though committed prior to its existence, appellant corporation is liable, and it would still be liable even though it had no knowledge of the fraud. Cator v. Commonwealth Bonding & Casualty Co. (Tex. Com. App.) 216 S. W. 140.

There is no contention that there is not in the hands of appellant sufficient assets, obtained by the conveyance of the common-law trust company, to satisfy this judgment. The failure of appellant to introduce any evidence to contradict the testimony introduced by appellee leaves a wide field for conjecture and inference, in the face of such strong testimony of appellee supporting the allegations of fraud. It was not error for the court to refuse to instruct a verdict in favor of appellant. To have done so in the face of this record would have been incomprehensible.

[3, 4] What we have said here applies as an answer to appellant's proposition No. 5. There is nothing in appellant's contention, in either the law or the facts of the case, that would have justified the court in instructing a verdict that the plaintiff waived his right to rescission. The giving of proxies alone to vote his stock would not estop him. It would take evidence and a full knowledge of all the facts surrounding the transaction to bind one. The true rule of law on this subject, as settled by the Supreme Court is as follows (Labbe v. Corbett, 69 Tex. 503, 6 S. W. 808):

"When once it is established that there has been any fraudulent misrepresentation * * * by which a person has been induced to enter into a contract, it is no answer to his claim to be relieved from it to tell him that· he might have known the truth by further inquiry. He has a right to retort upon his objector: 'You, at least, who have· stated what is untrue * * * for the purpose of drawing me into a contract, cannot accuse me of want of caution, because I relied implicitly upon your fairness and honesty.'" Sanders v. Hickman (Tex. Civ. App.) 235 S. W. 278; Graves v. Haynes (Tex. Com. App.) 231 S. W. 383; Moore v. Beakley (Tex. Com. App.) 215 S. W. 957; Corpus Juris, vol. 27, p. 17; Hoyt v. First Nat. Bank (Tex. Civ. App.) 247 S. W. 638.

[5, 6] The burden of proof is upon the appellant, who claims that the appellee is estopped or has waived his right to complain of fraud, on the theory that he gave a proxy, to show that that proxy was present and participated in the meeting. The appellee would not be estopped, nor be held to waive any right, merely because he gave a proxy. It is the participation in the meetings of the company through a regularly constituted agent exercising rights under the proxy that might constitute a ground for waiver, ·or create estoppel, and the burden is upon the company asserting waiver to show that the proxy was voted. Commonwealth Bonding & Casualty Co. v. Cator (Tex. Civ. App.) 175 S. W. 1076; Cattlemen's Trust Co. v. Beck (Tex. Civ. App.) 167 S. W. 754; Kampman v. Tarver, 87 Tex. 491, 29 S. W. 768.

A·stockholder who is present by proxy, but who declines to vote on the action that is urged as the basis upon which waiver is predicated, cannot be held to have assented to such action, and is not bound thereby, by his mere presence when he does not vote, nor when he votes against the proposition, such action or nonaction alone cannot be held to constitute waiver. Cattlemen's Trust Co. v. Beck (Tex. Civ. App.) 167 S. W. 754.

[7] A defrauded party will not by delay be held to waive a fraud, but he would lose the right of action by the statute of limitation. C. B. & Casualty Co. v. Meeks (Tex. Civ. App.) 187 S. W. 682; G. H. & S. A. v. Cade (Tex. Civ. App.) 93 S. W. 124.

[8] Appellant's propositions 6 and 7 contend that the amount of the recovery awarded to the plaintiff, as a part of the rescission, should be reduced to the extent that the money parted with by the appellee was kept by the agent for commissions. The evidence indicates that 39 per cent. of this amount was diverted by the common-law trust to pay the agent, who aided in the perpetration of the fraud. Of course that raises a fundamental error. That sum never went into the hands of the appellant. Even, though it might be recovered against the common-law trust company and its officers on the ground of fraud, it never passed into appellant's hands.

[9] It will not affect the rights of a stockholder, who desires to rescind and cancel his stock in a going concern, if the other stockholders do not do so but prefer to remain in the corporation. His rights then become superior as a creditor to those remaining, but this would not be the case where a corporation is in process of liquidation, and the other stockholders were equally defrauded. Scow v. Bankers' Life, 109 Neb. 241, 190 N. W. 858; Joyce v. Eifert, 56 Ind. App. 190, 105 N. E. 59; Stalnaker v. Gum, 87 W. Va. 283, 104 S. E. 730; Latulippe v. New Eng. Inv. Co., 77 N. H. 31, 86 A. 361; Park v. Kribs, 24 Tex. Civ. App. 650, 60 S. W. 909; Gress v. Knight, 135 Ga. 60, 68 S. E. 834, 31 L. R. A. (N. S.) 900.

[10, 11] Appellant's eighth proposition is that the parol evidence offered tends to, and does, contradict the express terms of the written trust, and is not admissible. The terms of the trust provide "no conditions or agreement other than those contained in the application and in the company's literature

shall be binding upon either party." This investigation has disclosed a fraudulent scheme to promote and sell capital stock of a common-law trust association. Fraud is one of the elements that allows testimony contradicting a fraudulent written contract, if such stands in the way of the truth, and that is true whether such representations be present, prospective, or promissory or relate to past or future matters.

A contract cannot be written, that will be allowed to conceal the fraud against a legitimate investigation. Edward Thompson Book Co. v. Sawyer, 111 Tex. 374, 234 S. W. 873. What is said here will also apply to appellant's ninth, tenth, and eleventh propositions. In the investigation of fraud, so secret in its nature and so hard to trace and run down, the broadest and most liberal rule of investigation is allowed. What we have said applies also to appellant's propositions 12, 13, 14, and 15.

[12, 13] Objection is made in propositions 16 and 17, that it was error to permit the witness Manlove to testify to hypothetical questions as to the value of the stock, because he was not qualified to give his opinion as an expert. We think the testimony is sufficient to show he was qualified to give his opinion as to the value of the stock. Such matters are usually left to the trial court's judgment and discretion. If he has some qualification, the witness is permitted to testify. The extent of his qualification goes to the weight of the testimony rather than to its admissibility. Corpus Juris, vol. 22, p. 526.

Appellant's propositions 18 to 20 all relate to the sufficiency of the evidence to support the jury's finding. Appellant, in his printed brief of 198 pages, with 24 pages in addition, and appellee, in his printed brief of 166 pages, have very fully set out in the proper place all the testimony, and we will not set out the testimony herein, to support the jury's finding, as it would make this opinion, already long, too long for any useful purpose. However, we will say that we have carefully scrutinized and examined the errors assigned and the findings of the jury, and the testimony upon which they are based, and say their separate findings are all supported by some material testimony. We have, in different forms, discussed appellant's propositions from 31 to 43 inclusive, and it is not necessary to again discuss them separately. We find nothing new in them. They have been carefully considered, and we find them without merit.

[14, 15] The suit is not based solely on the right to recover judgment against the parties on the ground of the fraud perpetrated, but is a suit for the rescission of the contract and judgment for the damages based upon the fraud committed. In this case, Vernor is not a necessary party to this suit,

because he has parted with his interest and his trust by a sale to appellant, who, as a part of the consideration, has assumed Vernor's obligations and guaranteed him against loss. Were it a case for recovery on the sole ground of fraud then Fanning could also be held on his fraud. As a suit for the rescission of the contract and cancellation of the stock, as Fanning owns no stock in appellant company and has no interest therein, he cannot be subjected to a personal judgment for subsequent acts.

It is true, on a question of fraud in which the agent knowingly participated and assisted in its perpetration, he may be joined in such an action of fraud. But that question does not arise here. This suit was for the rescission of the contract against a third party, appellant, the successor with whom Fanning has no connection. 31 Cyc. p. 1635, under note 84; vol. 2, C. J. p. 828, note 84; Sim v. Edenborn (C. C.) 163 F. 655.

We do not think under the pleadings and proof that any recovery can be had here against appellant S. H. Fanning. Appellee's suit is grounded upon, and the judgment based upon, the rescission, because of the fraud perpetrated upon appellee by the common-law trust company, through its trustee, Vernor, acting for it. In passing upon the question in this case on the point here raised on the question of the right of rescission and damages, we treat the question as though dealing alone with the pure trust, because the appellant is but the creature, with changed clothing, of the alleged common-law trust.

The appellant, who took over the trust properties of the trust company, did so with full knowledge of all the facts, because it was changed in name only, assuming, ratifying, and obligating itself to take care of all Vernor's trust obligations. Therefore appellee must be held to be entitled to recover from appellant the full amount of money received by it, which he, appellee, was induced to part with for the stock, notwithstanding the fact that a part of the money was paid for a commission to Vernor, who represented to appellee that there would be no such charge. Scow v. Bankers' Life, 109 Neb. 241, 190 N. W. 858; Joyce v. Eifert, 56 Ind. App. 190, 105 N. E. 59; Stalnaker v. Gum, 87 W. Va. 283, 104 S. E. 730; Latulippe v. New Eng. Inv. Co., 77 N. H. 31, 86 A. 361; Park v. Kribs, 24 Tex. Civ. App. 650, 60 S. W. 909; Gress v. Knight, 135 Ga. 60, 68 S. E. 834; 31 L. R. A. (N. S.) 900; Weissinger Tobacco Co. v. Van Buren, 135 Ky. 759, 123 S. W. 289, 135 Am. St. Rep. 502; Wesco Supply Co. v. El Dorado Light & Water Co., 107 Ark. 424, 155 S. W. 518.

No part of the money was paid to the agent, it was all directly paid to the trust company and to appellant. When the company approved and paid the money to the agent without appellee's knowledge or con-

sent, it was in clear violation of the representations made to appellee when his subscription was procured, and the money paid.

[16] The so-called common-law trusts have long been in existence in England, and a large per cent. of business is, and has been, done in this country as well as in England by such trusts. But there are two kinds of so-called trust estates in effect and operation in this country. The first we shall deem partnerships. They are those where is reserved to the interested parties some management and control of the trust estate, as held in Connally v. Lyons, 82 Tex. 664, 18 S. W. 799, 27 Am. St. Rep. 935, by our Supreme Court, which recognized the right of a trustee to carry on a business trust enterprise as a trust as distinguished from a partnership, also Chase v. York County Savings Bank, 89 Tex. 316, 36 S. W. 406, 32 L. R. A. 785, 59 Am. St. Rep. 48; Houston Oil Co. v. Village Mills (Tex. Com. App.) 241 S. W. 122. As to the holding of the Massachusetts trust, see what that court holds in Williams v. Milton, 215 Mass. 1, 102 N. E. 355. In that case the distinction is drawn between organizations held to be trusts and those construed to be partnerships. We also call attention to the case of Eliot v. Freeman, 220 U. S. 178, 31 S. Ct. 360, 55 L. Ed. 424, by the Supreme Court of the United States and the case of Crocker v. Malley, 249 U. S. 223, 39 S. Ct. 270, 63 L. Ed. 573, 2 A. L. R. 1601, decided in 1919 by the Supreme Court of the United States, in which the court refers to common-law trusts as a well known institution of law.

In the case of Hecht v. Malley, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949, the Supreme Court of the United States said this about the Massachusetts cases:

"Under the Massachusetts decisions these trust instruments are held to create either pure trusts or partnerships, according to the way in which the trustees are to conduct the affairs committed to their charge. If they are the principals, and are free from the control of the certificate holders in the management of the property, a trust is created; but if the certificate holders are associated together in the control of the property as principals, and the trustees are merely their managing agents, a partnership relation between the certificate holders is created."

That there is nothing new about the use of trusts for carrying on business enterprises, is shown by the fact that the English case of Cox v. Higman, 8 R. L. C. 268, 9 C. B. 47, decided by the House of Lords of 1860, such a trust was upheld, three of the Lords held it a partnership, and five held that it created a trust. Again in the case of Smith v. Anderson, 15 Ch. Div. 247, 285, decided in 1880, a trust for the operation of a submarine telegraph company was upheld.

It will be seen from all of these cases that the question, whether an instrument

271 S.W.—16

creates a trust or partnership, is determined upon the amount of control retained by the beneficiaries. If that was the law when our Supreme Court first decided the Connally v. Lyons Case, and if that has been the common law adopted by our state, then it does not seem reasonable that any legislative act not undertaking to prohibit trusts, or to deal with trusts, can be held to change the substantive law of the state by an act dealing only with the matter of procuring service and the rendition of judgment, which act was passed only to get away from the difficulties incident to the rule that in suing partnerships all members of the firm were required to be sued.

[17] As going to show that the trust estate did not create a partnership, Vernor was the sole person to manage, control, and to organize another corporation, to purchase and take over the assets of the trust, and to make the conveyance without let or hindrance or joinder of any person thereto. It is true there is a provision to require him to make annual financial reports to the shareholders, but with a string tied to it, it further provided:

"The shareholders shall have no right to call for any partition, accounting, or division of the property, or of the trust fund, or estate, profits, rights, or interest, unless the same is withheld by the willful default or willful neglect of the trustee."

The case of McCamey v. Hollister (Tex. Civ. App.) 241 S. W. 689, cited by appellee, is now pending in the Supreme Court on a writ of error, —— S. W. ——.

[18, 19] So from the declaration of trust the Stock Raisers' Loan Company creates a pure trust, for no right of control or management in or, of changing the declaration of trust is retained by the beneficiaries. We do not think there is anything in the articles of our statutes or in the rule of procedure that limits or restricts the right in respect to the creation of trust estates long recognized by equity and the common law, but that such trust and the right of trustees to act for associations of persons has been expressly recognized by the Legislature of Texas since the trading or business trust became a common institution in this state. The common law of England, unless inconsistent with our Constitution or laws, is by our own statute made the rule of decision. No feature of the common law of England is more thoroughly established or more generally recognized than the subject of trust estates and the right to its creation, and never limited by our Constitution or laws.

It is apparent from what we have said that the so-called common-law trust was not a partnership, but a trust estate pure and simple, and appellant, the successor, is liable only for the funds actually received by it for the reasons given in our opinion. Ap-

pellants commendingly call our attention to the well written article in the Texas Law Review, vol. 2, No. 2, dated February, 1924, by Professor Ira P. Hildebrand, the present dean of the law department of the University of Texas. This article we especially commend. It is well considered and abundantly supported by authority.

The court erred in rendering any judgment against appellant S. H. Fanning, and as to him the judgment is reversed, and judgment is here rendered that appellee take nothing by reason of his suit against said Fanning, and that the latter have and recover of appellee all costs incurred in his behalf. The former opinion is withdrawn, and this is filed in lieu thereof.

As to appellee, the judgment will be reversed, and the cause remanded, unless appellee shall, 'within 15 days from the date hereof file a remittitur remitting 39 per cent. thereof, so as to make the judgment for $6,100 with 6 per cent. interest per annum from the 16th day of September, 1923, in which case the judgment of this court will be permitted to stand for the latter amount.