## RIEDEL v. C. R. MILLER MFG. CO.
### (No. 10407.)

Court of Civil Appeals of Texas. Dallas. May 7, 1929.

Rehearing Denied June 8, 1929.

Church, Read & Bane and R. J. Dixon, all of Dallas, for appellant.

Caldwell, Gillen, Francis & Gallagher, of Dallas, for appellee.

LOONEY, J. Murl M. Riedel sued C. R. Miller Manufacturing Company, a corporation, to rescind two stock subscription contracts and to recover certain payments made thereon, on the ground that he was induced to make the contracts by false and deceitful representations.

Defendant filed a general denial and specially pleaded that its agent, who it was alleged made the false representations, was not authorized so to do and, in fact, had no authority to make any statement, promise, or agreement in selling its stock, other than as authorized by the terms of the written contracts entered into between the parties.

Judgment was rendered for defendant on an instructed verdict, on the idea that plaintiff was precluded from recovering by reason of the terms of the subscription contracts. Plaintiff insists that, notwithstanding the terms of contracts referred to, he was entitled to rescind because of the fraud of defendant's agent that induced him to make the contracts, and, as the evidence supported his theory, the court erred in directing a verdict for defendant.

It appears that about December 5, 1925, plaintiff subscribed for ten shares of the common stock of defendant company and ten shares about January 16, 1926; that one ground for rescission alleged by plaintiff was that defendant's agent, Mr. Reiger, misrepresented the value of the stock contracted for.

The blended testimony of plaintiff and his wife on this issue is to the effect that defendant's agent represented the stock to be worth on the market $130 per share; that it was the intention of the company (by March 1, 1926) to raise the price to $140 per share (implying that the company's assets justified the increase); that the company was in a prosperous condition; had been paying 12 per cent. dividends annually (implying that its earnings justified the payments); that it had enough products sold to insure payment of dividends for a year; had increased its mill capacity, and expected to do a larger volume of business in 1926 than it had done in 1925, and might be able to pay an extra dividend. These oral representations of agent Reiger were in substantial accord with the rather equivocal printed matter put out by the company and used as an inducement to secure plaintiff's subscription, as follows:

"An invitation is hereby extended to —— —— to become a stockholder in the C. R. Miller Manufacturing Company, dividends being paid quarterly.

"Our mills continue full-time operation on a satisfactory basis, due very largely to our advantageous location as regards market, labor, cotton and power. Our garment factories have set new high figures in volume, being now very largely over-sold, and likewise the cotton mills, which continue a day-and-night operation on a profitable basis, with the production sold up as far in advance as we care to sell without considering commitments yet to come from regular customers.

"12% dividend. Will you receive a dividend check January 1, 1926? The C. R. Miller Manufacturing Company is now paying dividends at the rate of three per cent quarterly and the next dividend will be paid to stockholders January 1, 1926. A quarterly dividend of three per cent is equivalent to more than thirteen per cent annually. Where else can you employ your money so profitably? In twenty-two years since organization dividends have totalled $1,381,250.64.

Dividends are at present being paid at the rate of three per cent quarterly, which is twelve per cent per annum, balance of earnings being carried to surplus. Remember, dividends are paid quarterly.

"If interested in making a safe and sound investment in a dividend-paying company that uses cotton, the principle crop of the Southland, and makes a product used in every home, mail the enclosed card for complete information."

The testimony of plaintiff was further to the effect that he received only two 3 per cent. quarterly dividends, one in January and the other in April, 1926; that on investigation made about July 1, 1926 (about six months after his last purchase), he ascertained that the market value of the stock was from $50 to $65 per share. Mr. Miller, president of defendant, testifying in April, 1928, said no dividends had been paid by the company for a year and a half, that is, since about September, 1926; that its stock had no market value and he knew of no stock selling on the market since May or June, 1926.

■ This evidence, in our opinion, sufficiently supported the issue of fraudulent representations as to the value of the stock subscribed for to have required its submission to the jury; but as the case will be remanded, we refrain from any expression of opinion as to its probative value.

■ Defendant contends, however, that although its agent may have misrepresented the value of the stock, plaintiff has no right to rescind, because the representations were not authorized by, but were entirely aside from, the written contracts. This contention is based upon the following paragraph, common to both subscription contracts:

"Furthermore, I agree that this instrument contains the entire contract between C. R. Miller Mfg. Company and myself as subscriber, and that I am subscribing for this stock solely upon the terms, conditions, statements and representations contained in this agreement, and in the printed matter prepared and issued by said company, and I am aware that the person taking this subscription has no authority whatever to change the same in any manner, or to make any promises, inducements or representations not contained herein, or in the printed matter above referred to. I am further aware that all these matters are set forth in this instrument for the protection of myself and the company."

We cannot accept defendant's view. The doctrine, well established in this state, is that, in actions for rescission, such as the one at bar, a principal cannot escape the consequences of a fraud perpetrated by an agent by simply inserting in the contract a provision such as we are now considering. The following cases are in point: Case Threshing Mach. Co. v. Webb (Tex. Civ. App.) 181 S. W. 853–856; Kirby v. Thurmond (Tex. Civ.

App.) 152 S. W. 1102; United States Gypsum Co. v. Shields (Tex. Civ. App.) 106 S. W. 724; Advance-Rumely Thresher Co. v. Higgins (Tex. Civ. App.) 279 S. W. 531–535; Detroit Automatic Scale Co. v. G. B. R. Smith Milling Co. (Tex. Civ. App.) 217 S. W. 198–200; Cattle Raisers' Loan Co. v. Sutton (Tex. Civ. App.) 271 S. W. 233–239; Landfried v. Milam (Tex. Civ. App.) 214 S. W. 847. In Case Threshing Mach. Co. v. Webb (Tex. Civ. App.) 181 S. W. 856, the court in dealing with a similar state of facts, used this language:

"A principal cannot gain immunity from the consequences of his fraud by the insertion in the contract of a provision such as is contained in the contract in question, nor can he in that manner evade responsibility for the fraud of his agents which inured to his benefit."

In Cator v. Commonwealth Bonding & Casualty Ins. Co., 216 S. W. 140–143, the Commission of Appeals announced the following doctrine pertinent here. The court said:

"That the corporation was without knowledge or notice of the fraud is immaterial. No liability is sought to be imposed upon the corporation. Plaintiff in error seeks only to be relieved from liability under a contract having its inception in fraud. He seeks to prevent the corporation from deriving any benefit under such contract. Relief is granted, not because of the culpability of the corporation, nor because it was guilty of any wrong in the premises, but only on the ground that it can derive no benefit or profit from the contract thus procured."

The only Texas cases cited by defendant in support of its position in this issue are National Guarantee & Loan Co. v. Thomas, 28 Tex. Civ. App. 379, 67 S. W. 454; National Equitable Society v. Carpenter (Tex. Civ. App.) 184 S. W. 587; and Reagen v. National Equitable Society (Tex. Civ. App.) 202 S. W. 157. The first case mentioned was an action for damages for breach of a contract for a loan, based upon false representations, and is therefore not in point in an action for rescission. The other two cases, if in point, which is not altogether clear, are so against the overwhelming weight of authority in this state they cannot be considered in this connection.

■ Another ground for rescission, relied on by plaintiff and supported by evidence, was that he was induced to make the subscription contracts by reason of certain fraudulent promissory representations made by defendant's agent, without intention of complying, to this effect, that defendant would guarantee payment of 12 per cent. annual dividends for two years, and if dividends were not paid as represented, or if plaintiff was unable to pay the note given for the deferred payment for the stock, defendant in either event would sell the stock for the price paid, for plaintiff's benefit, or would cancel the subscription contracts and return all payments made. Mr. Miller, the head of the company, testified that Reiger was not authorized by the company to make any such promises.

The general rule is that, in order to justify the rescission of a contract for a false representation, it must relate to a past or present fact or state of facts. The evidence on this issue, in our opinion, would justify a finding that the promise to pay dividends was based on the existence of represented facts; that is, that the company had sold enough products to insure payment of dividends for one year, was enlarging its mill capacity, putting in new machinery, and preparing to do a larger business in 1926 than it had done in 1925; hence the representations cannot be correctly termed mere predictions, or the expression of opinions. 1 Black on Rescission and Cancellation, § 86, p. 214.

■ But aside from this, the issue of unredeemed promises should have gone to the jury under the rule announced by the same authority (section 90, p. 228), as follows:

"While the authorities generally hold, as stated in the preceding section, that an unredeemed promise does not constitute a false representation such as will justify the rescission of a contract, yet it is also agreed that a promise or promissory representation made without any intention of performing it, or is made with a positive intention not to perform it, and made by the promisor for the purpose of deceiving the promisee and inducing him to act where he otherwise would not have done so, constitutes legal fraud."

While this rule has not found universal acceptance, it is nevertheless supported by the weight of authority and has been adopted by the courts of this state. See Touchstone v. Staggs (Tex. Civ. App.) 39 S. W. 189; Mutual Reserve Life Ins. Co. v. Seidel, 52 Tex. Civ. App. 278, 113 S. W. 945, 946; Chambers v. Wyatt (Tex. Civ. App.) 151 S. W. 864–866; South Texas Mortg. Co. v. Coe (Tex. Civ. App.) 166 S. W. 419–421; Cearley v. May, 106 Tex. 442, 167 S. W. 725, 726.

In view of the testimony of Mr. Miller, to the effect that the agent Reiger had no authority whatever to make these promises, a jury could, with propriety, have found that they were made by the agent deceitfully, knowing the company would not perform. So we hold that the evidence on the issues discussed justified, in fact required, their submission to the jury; that the court erred in directing a verdict for defendant. Therefore the case is reversed and remanded.

Reversed and remanded.