**NATIONAL BANKERS LIFE INS. CO.**

v.

**WATSON.**

No. 6336.

Court of Civil Appeals of Texas. Amarillo.

Oct. 19, 1953.

Rehearing Denied Nov. 23, 1953.

McWhorter, Howard, Cobb & Johnson and H. Ernest Griffith, Lubbock, for appellant.

Morehead & Boyd, Plainview, for appellee.

PITTS, Chief Justice.

Appellee, Cecil S. Watson, instituted this suit against appellant, National Bankers Life Insurance Company, a corporation, for the rescission of a contract. Appellee based his cause of action upon alleged false and fraudulent representations made to him by appellant's agent, E. P. Saunders, and appellee's reliance thereon. Trial was to the court without a jury and judgment was rendered for appellee granting the relief sought from which an appeal has been perfected.

The contract in question, denominated "Resident Director Investment Contract No. 128572", is admittedly a dual contract in form and under its terms, providing for both a return on an investment made and life insurance protection. It is likewise admitted to be "Basically, a saving investment plan for the owner", which "provides maximum returns consistent with safety".

Appellee charges that he was induced to execute the contract by E. P. Saunders, appellant's legal agent, as a result of false and fraudulent representations made to him by the said agent as to the investment qualities of the contract in particular. Appellant joined issues with appellee on such charges and likewise pleaded the law of estoppel and laches as defenses.

The record reveals that appellee testified he was married and was a farmer who operated his own farm. While so engaged on October 10, 1950, appellant's said agent visited him in his field where he was sowing wheat, explained the contract in question at length and sought an execution thereof by appellee. According to appellee's testimony further the agent there represented to him that appellant's company was experiencing a period of rapid growth and as a part of its expansion program appellant was offering for advertising purposes to a limited group of substantial citizens a number of special investment features in the contract, making it primarily an investment contract which would pay an interesting profit. The annual pecuniary investment benefits under the terms of the contract stressed were the issuance of 25 shares of company stock which the agent said had a par value of $100 each and which bore annual dividends of 10%, together with an annual guaranteed cash payment of $37.50 on the contract and an attached coupon for an annual amount of $43.50, which sums together with the $250 annual stock dividends amounted to a total sum of $331 to be received annually while the total annual contract deposit was $675, which sum covered the annual premium on a $5,000 participating life policy with double indemnity and other attractive features to be issued on the life of appellee. Appellee further testified that the agent stressed the fact that it was primarily an investment contract for appellee's benefit and at the same time make appellee a stockholder of appellant's company in that area who would cooperate with appellant and help it sell insurance, although appellee would not, as such stockholder, be responsible for the affairs of the company. Appellee declined the offer because he was not interested in the insurance and he was a farmer and helping to sell insurance was out of his line of business. But, upon the insistence of the agent, he signed the application upon the promise of the agent that the offer would be kept open to him for a period of three weeks when the agent would return to see if appellee had changed his mind.

The said agent returned on October 30, 1950, to find appellee again at work in the field when appellee told the agent he had deliberately decided not to accept the offer. The surprised agent, who had brought the prepared contract with him on that occasion, again explained the contract to appellee in the presence of appellee's wife, whose testimony corroborated that given by appellee, and again made the same representations to appellee he had previously made. Relying upon the agent's representations as to the contents of the contract and particu-

larly the investment features not fully therein reflected, including the 25 shares of stock at par value of $100 each with an annual 10% dividend or $10 per share each year and other attractive investment features, appellee accepted the proposal on October 30, 1950, gave a check to the agent for $675 as the first annual deposit, accepted the contract and signed a receipt therefor without reading it, thinking at the time, however, that he was signing the contract at the request of the agent but learned later he had signed a receipt, which the agent had previously prepared.

Appellee further testified that he was satisfied with the contract at the very time he parted with the first deposit and received it, but he thereafter discovered the misrepresentations of appellant's agent and then became dissatisfied. He further testified that he examined the contract soon after receiving it and then found its terms less attractive in some respects than had been represented, to him by the agent, but still he thought the 25 shares of stock at par value of $100 each, bearing an annual dividend of 10%, as represented to him by the said agent, would net him $250 per year, which, together with the annual guaranteed cash payment of $37.50 and the annual coupon payment of $43.50, would make it an attractive investment. Appellee thereafter made a second annual deposit as provided for under the terms of the contract but soon thereafter became curious to know more about the terms of his investment after he had personally examined appellant's annual report of the company. On April 29, 1952, he wrote a letter to Pierce P. Brooks, President of National Bankers Life Insurance Company, appellant, asking him to advise the par value of the shares of stock he held under his "Resident Director Participating Contract", and asking him also to advise the amount of annual cash dividends per share received on such an investment and when such would be available to him. Having received no reply to his said letter on May 11, 1952, appellee wrote a second letter to President Pierce P. Brooks and sent it special delivery, making the same inquiries as made in his previous letter. Soon

thereafter appellee had a letter of date May 12, 1952, from appellant, signed "L. Griffin" and another of date May 14, 1952, signed "(Miss) M. E. Gregory, Secretary" both advising him that the par value of the stock was $10 per share and the last dividend paid by the company was 10% or $1 per share. Thereafter on May 28, 1952, appellee wrote to President Pierce P. Brooks, setting forth at length the representations made to him by appellant through its agent, E. P. Saunders, to the effect that through his investment contract appellee would receive an annual return on his investment of $250 dividend on shares of stock, together with $37.50 annual cash and $43.50 annual coupons and that unless such be true he was then calling upon appellant for a rescission of the contract and a return of the two deposits appellee had made under the terms of the contract. Thereafter appellee received a reply to his letter from President Brooks admitting that Saunders had represented appellant in the execution of the contract but denying that Saunders made the representations appellee charged he had made with reference to the par value of the stock and the amount of annual dividends and refused the request for rescission of the contract and the return of the deposits appellee had made with appellant. As a result this suit was soon thereafter filed within a reasonable time.

Appellant's agent, E. P. Saunders, testified for appellant and admitted closing the contract with appellee as appellant's agent but denied telling appellee the par value of the stock would be $100 per share and that he would receive an annual 10% dividend thereon. The witness further testified that the contract was a dual contract of investment as well as one of insurance and that without the investment features therein expressed the annual deposit would have been less than $675 for appellee whose age was then 36. There is testimony in the record to the effect that the annual premium on a life insurance policy alone for such amount at such an age without the investment features would be less than half the annual deposit required under the terms of the contract being here considered. The record re-

flects that the alleged representations made to appellee by appellant's agent, Saunders, were supported by appellant's President, Pierce P. Brooks, himself when he stated in a letter of transmittal of the contract in question attached thereto that "Basically, this contract is a saving investment plan".

According to the record and the interpretation given the terms of the contract by appellant's officers, the relationship between the parties to the contract in question is not alone that of insurer and insured under an insurance policy, but such is primarily that of an investor and investee under the terms of an investment contract, which apparently contains a merger clause. The contract recites in part that it, together with the application therefor, shall constitute all of its terms, and that all statements made by or on behalf of the insured shall, "in the absence of fraud", be deemed representations and not warranties. It further provides that no contention, provision or privilege can be waived or modified except by indorsement of an officer of the company and that no agent has authority to modify or change the terms thereof or to bind the company by promises made. The controversy here, however, is not concerned with any attempt of the agent to modify or change the terms of the contract and make it different from that authorized by appellant as the agent's principal. The controversy is concerned with collateral matters, particularly with the alleged wrongful construction the agent gave the terms of the contract and the investment values not therein reflected by its terms.

For these reasons we believe the trial court was justified in concluding that the provisions of the Articles cited by appellant from the Insurance Code of Vernon's Annotated Statutes concerning life insurance contracts are not controlling in the issues here presented. It must be remembered that this is a suit for rescision and not one for damages.

 Generally fraud, properly presented by the defrauded party, vitiates the terms of a contract since there was no real assent when the making of the purported contract has been induced by fraud. However, such a contract is not void but only voidable at the election of the defrauded party, who may, upon the discovery of fraud, affirm the contract and sue for damages or ask for rescission of the contract unless special circumstances prevent such or make it impossible to restore the status quo. Trinity-Universal Ins. Co. v. Maxwell, Tex.Civ.App., 101 S.W.2d 606; 10 Tex.Jur. 63, paragraph 35, and other authorities there cited.

 Fraud in the procurement of a written contract may be shown notwithstanding provisions therein contained having a tendency to establish its validity. A seller should not be allowed to benefit from a fraud perpetrated by its own agent even though the seller may be innocent. However, under such circumstances rescission and restitution is generally proper rather than to make the innocent seller liable for damages by reason thereof. Super-Cold Southwest Co. v. Willis, Tex.Civ.App., 219 S.W.2d 144, and other authorities there cited.

 The doctrine is well established in this state that in an action for rescission, such as the one at bar, a principal cannot escape the consequences of fraud perpetrated by an agent by simply inserting in a contract that the agent has no authority to make representations not contained in the contract. Riedel v. C. R. Miller Mfg. Co., Tex.Civ.App., 18 S.W.2d 264, and other authorities there cited.

 ▪ In the case of Bankers' Trust Co. v. Calhoun, Tex.Civ.App., 209 S.W. 826, 829, writ refused, often thereafter cited with approval, the court said:

"The general rule is:

"'Where an agent in negotiating a transaction or making a contract on behalf of his principal makes representations, declarations and admissions in connection therewith respecting the subject-matter, they will be binding on

the principal, where they are made at the time, and as a part of, the transaction, and although they are false and fraudulent, made without the knowledge or authority of the principal, and even though contrary to the instructions of the principal, and constitute a breach of trust against the principal.'"

The contract in the instant case was prepared and executed by the agent on behalf of his principal and the alleged representations, if made, were material representations made in connection therewith respecting the subject matter.

In the case of Deaton v. Rush, 113 Tex. 176, 252 S.W.1025, the court held that a defrauded party is not required to call for a rescission of a contract upon a first discovery of material misrepresentations made by his adversary. Such party may waive them or take advantage of them after he has thereafter made discovery of other material misrepresentations as a result of further investigations, at which time he may then call for rescission because of all of the discovered false or fraudulent representations. It appears from appellee's testimony that he did not call for rescission upon his first discovery of misrepresentations, but he immediately called for rescission and soon filed suit therefor upon discovery of more serious alleged misrepresentations. The record reflects that appellee took action within a reasonable length of time after his final discovery of the very material misrepresentations, as reflected by his own testimony.

A similar factual situation existed in the case of United Bankers Mut. Life Ins. Co. v. Clemons, Tex.Civ.App., 232 S.W.2d 622, when suit was there filed for rescission of a combination stock purchase contract and an insurance contract where alleged misrepresentations were made concerning collateral matters affecting the value of the contract, just as was done in the case at bar. Rescission and restitution were there awarded plaintiff and the court there held the provisions of the Insurance Code were not controlling.

In the case of Wink v. Wink, Tex.Civ. App., 169 S.W.2d 721, 723, the court held that the fraudulent representations of an agent committed within the scope of his employment are binding on the principal, even though the principal did not know of or authorize the representations to be made. Such holding is supported by the following language:

"The rule is thus stated: 'For frauds and misrepresentations of his agent within the scope of the employment, the principal is liable no less than in other cases, and this although he had no knowledge thereof, and has received no benefit therefrom.' Boyd v. Eikenberry, Tex.Civ.App., 99 S.W.2d 701, 703, modified by the Commission of Appeals, 132 Tex. 408, 122 S.W.2d 1045; 21 R.C.L. 85. See also Commonwealth Bonding & Casualty Ins. Co. v. Meeks, Tex.Civ.App., 187 S.W. 681, writ refused; 20 Tex.Jur. p. 97, § 62."

In the case of Mutual Reserve Life Ins. Co. v. Seidel, 52 Tex.Civ.App. 278, 113 S.W. 945, 946, the court said:

"* * * fraud of the authorized agent will invalidate a contract entered into by him on behalf of his principal, though in perpetrating the fraud he acted without the knowledge or consent of the principal. Henderson v. San Antonio & M. G. Railway, 17 Tex. 560, 67 Am. Dec. 675; Wright v. Calhoun, 19 Tex. 412; C. Aultman & Co. v. York, 71 Tex. 261, 9 S.W. 127; McFarland v. McGill, 16 Tex.Civ.App. 298, 41 S.W. 402."

That case has since been many times cited with approval.

Under the record and authorities cited it is our opinion that appellant is not entitled to have the benefit of the law of estoppel. Neither is the claim of laches applicable. Brady v. Garrett, Tex.Civ.App., 66 S.W.2d 502; Turner v. Hunt, 131 Tex. 492, 116 S.W.2d 688, 117 A.L.R. 1066; Hines v. Chaddick, Tex.Civ.App., 63 S.W. 2d 263.

While the material charges of fraud are here controverted, it is our opinion, under the rules of law governing such matters, that the pleadings and the evidence support the trial court's judgment. Appellant's points of error to the contrary are all overruled and the judgment of the trial court is affirmed.