14544

BECKROGE v. SOUTH CAROLINA PUBLIC SERVICE CO.
(Two Cases)

(193 S. E., 315)

212

*Messrs. Hagood, Rivers & Young,* for appellant, cite:

*Messrs. Paul M. MacMillan* and *Louis M. Shimel,* for respondents, cite:

October 12, 1937.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

This is an appeal from two separate judgments. The actions were commenced separately, but tried together, and separate judgments were entered. The decision in each case depends on the same issues of law and fact. This being true, we will in our discussion specifically refer only to the case of the plaintiff, F. Addie Beckroge.

In her complaint it is alleged that on December 6, 1930, she purchased 37 shares of stock of the Central Public Service Corporation, and paid therefor $2,220.00, and that she paid $720.00. as partial payments on other shares in the same corporation, all of which she purchased and acquired through the defendant, South Carolina Public Service Company, its agents and servants. That the defendant agreed and promised to refund to her the purchase money of so much of the stock as was paid for in full, and to return all partial payments, with interest at 5 per cent., at any time she requested it. That thereafter the plaintiff tendered to the defendant the stock so purchased by her, and· requested the defendant to comply with its agreement and refund to her the money she had paid; that the defendant did return to the plaintiff the sum of $754.39, this being the amount of the partial payments on certain shares of stock, with 5 per cent. interest as agreed, but that it has failed and refused to refund to her the sum of $2,220.00 paid for the aforesaid 37 shares of stock, which are now approximately worthless and unmarketable. The prayer of the complaint is for $2,-220.00, and costs.

The defendant denied the material allegations of the complaint, and pleaded the statute of frauds; and further, that the alleged contract, even if made—which it denied—was *ultra vires,* beyond the corporate powers of the defendant,

the said capital stock of the Central Public Service Cor-
poration being neither the capital stock of the defendant nor
owned by it; and further alleged that under its charter it
had no power or authority, to engage in the sale of the cap-
ital stock of other corporations now owned by it. The de-
fendant also set up in its answer that the alleged contract to
repurchase the stock bought by the plaintiff, even if made—
which it denied—lacked consideration, and also that such
alleged contract or agreement did not provide that it was
to be performed within the space of one year from the mak-
ing thereof, and for that reason was unenforceable, under
Section 7044 of the 1932 Code of Laws.

We assume that the defense pleaded, that the alleged
agreement was not to be performed within the space of one
year from the making thereof, has been abandoned. The
exceptions do not refer to this issue, nor does the brief of
appellant.

The defendant, which is known as the local gas company
in Charleston, was a constituent corporation of the Central
Public Service Corporation or system. The pyramid of this
system was composed of about 80 subsidiary corporations,
and the Central Public Service Corporation occupied its
apex. The proceeds derived from the sale of the stock pur-
chased by the plaintiff were to be used, and, in accordance
with the testimony, were used, for the benefit of the defend-
ant and other corporations in the system. Prior to the date
of the transaction here involved, the Central Public Service
Corporation, through A. E. Peirce & Co., in which latter
corporation some of the officers of the defendant gas com-
pany were also officers, initiated a stock-selling program for
the sale of the capital stock of the Central Public Service
Corporation, which was the parent corporation, and, in fur-
therance of the plan, sold a large portion of the stock in the
city of Charleston and elsewhere. In Charleston the sale of
the stock was handled by R. E. Johnson, and 18 or 20 em-
ployees of the defendant gas company, co-operating with
him, who actively solicited and pressed the sales in that city.

Johnson received a commission of $2.50 on each share of stock sold, and each employee similarly engaged received 50 cents a share for every share of stock he sold. Also co-operating and acting with Mr. Johnson were the local managers of the defendant gas company, who sold stock and received commissions thereon. Money received from the sale of the stock in cash by R. E. Johnson was turned in to the defendant's local office, and the defendant issued its check therefor payable to A. E. Peirce & Co., and money paid direct at the defendant's local office for stock was received and handled by its cashier, and remitted to A. E. Peirce & Co.

The stock in question was sold to the plaintiff by R. E. Johnson in the office of the defendant gas company and all payments made by her were made there. During the sales campaign, Johnson, who was not an employee of the defendant, was given the use of an office and a desk in the building of the defendant, and the plaintiff was instructed by Johnson to call him there on the telephone at any time she desired to communicate with him. This she did. She testified that Johnson stated to her, at the time she bought the stock, that he represented the defendant; that the investment was perfectly safe; that she could not possibly lose $1.00 of her money, and that either the defendant company or A. E. Peirce & Co., would refund her money whenever demand was made, on all shares paid in full by her; and that money paid on account, by way of partial payments, would be refunded, with 5 per cent. interest. Thereafter when she demanded of A. E. Peirce & Co. a refund of the partial payments made on account of stock, with 5 per cent. interest, she received a check from this company in full for such partial payments, and the manager of the defendant gas company came to her home with a release in connection with the refund, which she signed at his request.

This action is for a breach of the alleged contract on the part of the defendant for the repurchase of the stock bought outright by the plaintiff, and the refund of the amounts paid

by her in full for this stock. As heretofore mentioned, stock in the Central Public Service Corporation was sold to obtain funds for the upbuilding of the defendant gas company, and other companies in the group, and it was testified by a witness for the defense that funds so derived were actually used for the benefit of the defendant gas company in the City of Charleston.

A résumé of the testimony will make clearer the issues presented.

On the desk in the office of the defendant company, used by Johnson, were spread pamphlets and folders advertising the stock in question, which were distributed by Johnson and the regular employees of the defendant among customers and others to stimulate and effect sales of this stock issued by the parent company—the Central Public Service Corporation—of which the defendant was a subsidiary.

Desiring to dispose of her stock, the plaintiff first applied to A. E. Peirce & Co. at their Chicago office, and was advised by this company, in effect, on February 10, 1932, that the stock was practically worthless. It was then that she demanded of the local company that it comply with its alleged agreement to repurchase the stock and refund her money.

One of the folders distributed by Johnson from the office of the defendant was entitled, "How you can invest with safety at over 6¾%." On the first sheet of this pamphlet appears in pen and ink the name of "C. C. Heidt," who was the bookkeeper of the defendant, and the notation, "Phone 3974," which telephone number was that of the defendant. The employees of the defendant were requested by its manager to co-operate with Mr. Johnson in selling the stock of the Central Public Service Corporation. Frequent meetings were called by Johnson, attended by the employees of the defendant, who were there at the request of the defendant's manager, and who were schooled and instructed by Johnson in how to make sales talks to prospective customers. The

pamphlet to which we have referred contains the following statements and representations:

"How big is this Corporation?

"Central Public Service Corporation has assets of over $364,000.00. Its subsidiaries serve over 635,000 customers and more than 65,000 investors own its stock.

"How much business does the Corporation do?

"Its gross revenues for the year ending December 31, 1930 (exclusive of companies located in the Canary Islands) were more than $43,000.00.

"Are they safe?

"They represent an investment in one of the most essential of modern industries. Electricity and gas are necessities of modern life. Years of stable and increasing demand have given public utility securities an eviable record of safety.

"Where can I secure further information about this investment?

"Any employee will be glad to give you information about these shares. They may be purchased for cash or on the Thrift Plan—$10.00 a share with application and $10.00 a share monthly.

"Your investment in this nation-wide utility corporation is backed *not only by your local company* [italics ours], but by companies serving 683 other communities.

"* * * It gives you a place to put your savings where you know they will be safe and will earn for you a regular and liberal return."

Another folder distributed from the office of the defendant contains these further statements:

"Money for expansion benefits your community.—By investing in these shares you contribute directly to the prosperity of your own community. Every dollar goes into the upbuilding of the public utility system serving your own and other communities—for expansion, additions, and improvements, for acquisition of new properties; and for other corporate purposes.

"Wouldn't you like to be receiving an extra income of this kind?

"You can, by becoming one of the fifty thousand investors who now own shares in Central Public Service Corporation. This great utility system, *through one of its many properties* [our italics], serves you locally with electricity, gas, or other conveniences. Let it also bring you an income."

All of these statements were likewise made orally to the plaintiff by Johnson.

It developed from the testimony that the Central Public Service Corporation, some time prior to the institution of this suit, unloaded their stock on to some other corporation or corporations, and we gather it is now nonexistent. As stated by one witness for the defense, it has been disintegrated.

We should add, in order to make the statement of fact more complete, that the checks given in payment for stock bought by the plaintiff were made payable to Central Public Service Corporation; and that all receipts given to Mrs. Beckroge were signed, "Albert E. Peirce & Company, Ragner E. Johnson."

The first contention of the appellant is that the Circuit Court erred in holding that the statute of frauds is not applicable, under the facts of this case. The section of the statute of frauds invoked is Section 7045 (1932 Code), and provides as follows: "No contract for the sale of any goods, wares and merchandise for the price of fifty dollars or upwards shall be allowed to be good except the buyer shall accept part of the goods so sold and actually receive the same, or give something in earnest to bind the bargain, or in part payment, or that some note or memorandum in writing of the said bargain be made and signed by the parties to be charged by such contract, or their agents thereunto lawfully authorized."

The position of the respondent is that she is seeking to hold the defendant liable, not on the contract of its principal,

but on its independent original agreement, viz.: That, in consideration of the purchase of the stock by the plaintiff through it, the defendant agreed on its own behalf, and not on behalf of the principal, that it would repurchase the stock and refund the money at any time she wished to turn it in. The defendant denies that this agreement was made.

The question of whether or not the sale of existing corporate stock comes within the meaning of the statute of frauds has never been specifically presented nor passed upon by our Court. See *Gadsden v. Lance* (1841), 16 S. C. Eq. (McMull. Eq.), 87, 37 Am. Dec., 548; *Kirkpatrick v. Hardeman,* 118 S. C., 146, 110 S. E., 119. An examination of the cases, however, shows that the American authorities are practically unanimous in holding that a contract for the sale of existing corporate stock comes within the meaning of statutes equivalent and corresponding to the seventeenth section of the English statute of frauds, which provided that all contracts for the sale of goods, wares, and merchandise within the specified price shall be void, unless made in writing and subscribed by the party to be charged therewith, or unless the party either accepts or receives part of the goods, or at the time pays some part of the purchase price. With this holding we are in full accord. See *Spencer v. McGuffin,* 190 Ind., 308, 130 N. E., 407, and the note appended thereto in 14 A. L. R., 394, in which the cases in point are collected.

In *Tisdale v. Harris* (1838), 20 Pick. (Mass.), 9, which is a leading and much-cited American case, the Court, speaking through Shaw, C. J., stated: "There is nothing in the nature of stocks or shares in companies, which in reason or sound policy should exempt contracts in respect to them from those reasonable restrictions, designed by the statute to prevent frauds in the sale of other commodities. On the contrary, these companies have become so numerous, so large an amount of the property of the community is now invested in them, and as the ordinary indicia of property, arising

from delivery and possession, cannot take place, there seems to be peculiar reason for extending the provisions of this statute to them. As they may properly be included under the term 'goods,' as they are within the reason and policy of the act, the Court are of opinion, that a contract for the sale of shares, in the absence of the other requisities, must be proved by some note or memorandum in writing."

The question has arisen in several jurisdictions, whether the provision of the statute of frauds, heretofore stated, (a) embraces an agreement whereby a vendor of corporate stock promises to repurchase from his vendee on the happening of a certain contingency, or (b) an agreement whereby a person inducing a sale of stock not personally owned by him promises to buy it from the vendee under specified conditions. Agreements of the class first mentioned have been held not to fall within the statute. *Hankwitz v. Barrett,* 143 Wis., 639, 128 N. W., 430. See, also, *Korrer v. Madden,* 152 Wis., 646, 140 N. W., 325, 326, wherein the Court said: "Where corporate stock is sold, paid for, and delivered pursuant to an oral agreement, wherein the vendor as a condition of the sale agrees to repurchase such stock at the option of the buyer, the whole constitutes but an entire original contract that is sufficiently performed to take it out of the statute of frauds  *  *  *  so that the vendee may sue and recover from the vendor on the agreement to repurchase."

We think that the same rule should also apply, certainly under the facts of this case, with reference to agreements of the second class, and in our opinion this view is upheld by both the better reasoning and the greater weight of authority.

In the case of *Pierce v. Rothwell,* 38 Wyo., 267, 267 P., 86, 88, the Court was there concerned with a problem similar to that presented here. The applicable statute of Wyoming is substantially like our own statute. Therein the Court said: "Where the defendant acted as agent in the sale, but was an

officer of the corporation whose stock he sold, and was interested in its success, the weight of authority is to the effect that the contract is enforceable. There are two theories on which recovery is allowed: (a) On the theory that the oral contract is a part of the original contract of sale, and the delivery of the stock and payment therefor take it out of the statute. *Roberts v. Cauffiel*, 6 Pa. Dist. & Co. R., 706. (b) That the oral contract whereby the defendant agreed to take the stock off the plaintiff's hands, and refund the money or to repurchase it, is in the nature of a contract of indemnity, and therefore not within the statute. *Lingelbach v. Luckenbach*, 168 Wis., 481, 170 N. W., 711, 14 A. L. R., 380; *Kunzmann v. Petteys*, 74 Colo., 342, 221 P., 888; *Schaefer v. Strieder, supra* [203 Mass., 467, 89 N. E., 618]; *Trenholm v. Kloepper*, 88 Neb., 236, 129 N. W., 436; *Gurwell v. Morris*, 2 Cal. App., 451, 83 P., 578; *Clement v. Rowe*, 33 S. D., 499, 146 N. W., 700."

An oral agreement by the agent of a corporation, to induce a prospective customer to take stock therein, that he would pay her, upon demand, the amount of money paid for the stock, was held in *Trenholm v. Kloepper, supra,* not to be an agreement to purchase goods, wares, merchandise, or things in action within the statute of frauds, but an entire contract, the purchaser's part in which was fully executed. The Court said: "The transaction, as we view it, is not within the statute of frauds. The agreement is not * * * to purchase the stock sold to Mrs. Trenholm, but is an original undertaking on the part of the defendant that, if the plaintiff will purchase and pay for the stock, he will thereafter, upon a contingency, pay her a definite sum of money. On the plaintiff's part the contract was fully executed, and the defendant cannot escape the consequences of his undertaking because he did not own the stock purchased in reliance upon his promise. * * * The fact that the plaintiff is willing to transfer her stock to the defendant does not transform his contract into one of bargain and sale." Also,

see *Griffin v. Bankers' Realty Invest. Co.* (1920), 105 Neb., 419, 181 N. W., 169, and *Wooster v. Sage,* 6 Hun (N. Y.), 285, affirmed in (1876), 67 N. Y., 67.

In *Clement v. Rowe,* 33 S. D., 499, 146 N. W., 700, 701, the defendant, as agent of a corporation, orally agreed with plaintiff that, if he would convey certain land owned by him to said company in payment for preferred stock, and the company should fail to pay annually a seven per cent. dividend on said stock, the defendant would, upon the surrender of such stock, pay to plaintiff $16,000.00. The Court said:

"It is manifest from an inspection of the complaint that the facts in this case do not bring the oral contract sued upon within the provisions of Subdivision 4 of said section, and consequently the appellant's third contention is unavailing. * * *

"But if it be considered that Rowe, as secretary of the medicine company, was acting for the company in making the sale of the shares of stock, nevertheless the promise to repurchase was his own promise. In this view, which is the one most favorable to defendant, the promise to repurchase would partake of the nature of an oral contract of indemnity. Such a contract is almost universally held to be essentially an original contract."

To the same effect is *Hankwitz v. Barrett, supra.* In *Cooper v. Huerth,* 156 Wis., 346, 146 N. W., 485, 487, the defendants, as paid agents of a corporation, sold an automobile to the plaintiff pursuant to a written contract, and at the time of sale defendants orally agreed that, if the machine was not satisfactory, it was .to be returned and the notes given in payment thereof returned. The Court said: "That it was perfectly competent for defendants, though acting as agents, to bind themselves by a contract entirely outside the scope of their agency, and for the purpose of promoting their business as agents, there can be no doubt. *Hull v. Brown* [*supra*], 35 Wis., 652. The evidence tended to show that such .a contract was made. The jury intended to find that

such a contract was made. * * * It follows that the judgment should have been awarded to plaintiff on the verdict."

The facts in the case of *Hull v. Brown,* 35 Wis., 652, are quite similar to the facts in the instant case. Brown, as the paid agent, sold a mower to Hull. As an inducement to Hull to make the contract, Brown individually promised, orally, that if upon trial the machine was not satisfactory he might return it, and Brown was then to return the note, pay it himself, or reimburse or pay back to Hull the amount Hull had paid. Point was made that the contract was within the statute of frauds, and could not be proved by oral evidence. The Court said, in speaking of the agreement: "It was in the nature of a contract of indemnity, a promise to the plaintiff to return his note if the machine did not work to his satisfaction, or relieve and save him harmless from the payment of it himself. * * * It was, as we have said before, an original undertaking, made upon a valuable consideration and to subserve the business or pecuniary purposes of the defendant."

The plaintiff testified that the oral promise to repurchase her stock was made at the time the stock was sold to her—contemporaneously. We think this promise became an inseparable part of the consideration of the executed contract of sale, and is not within the statute. Also see *Oklahoma National Gas Corporation v. Douglas,* 170 Okl., 284, 39 P. (2d), 578, 101 A. L. R., 144, and the numerous cases cited therein; and note, 14 A. L. R., 402. The testimony tends to show that such a contract was made. The jury intended to find that such a contract was made; and it is clearly inferable from the evidence that the sale of this stock benefited, subserved, and promoted the business of the defendant.

Defendant contends that the alleged contract to repurchase is *ultra vires* and void, as being beyond its corporate powers; and that a verdict should have been

directed on the ground that the undisputed testimony shows that Johnson's agency was with Albert E. Peirce & Co., and that he had been licensed as their salesman; that the South Carolina Public Service Company had no license to sell stock and that, if Johnson represented that he was its agent, he was not acting within the scope of his agency because he was engaged in an unlawful activity that was not permitted.

It is undisputed that the defendant under its charter was given the power to purchase and sell stock of other corporations. The contention is made, however, that the defendant's charter does not empower it to act as an agent in the purchase and sale of securities of another corporation. The charter of the defendant grants broad powers, and, after a careful examination of it, we agree with the Circuit Judge that the defendant did have the power to enter into the alleged contract to repurchase the stock and repay the money received as the consideration therefor.

Section 20 of the charter confers the following powers upon the defendant:

"To purchase at a discount or otherwise acquire by exchange of its own stock, bonds, debentures or other securities or otherwise, take, subscribe for, contract to purchase, own, hold, sell, assign, transfer, mortgage, hypothecate, pledge, contract to sell or otherwise dispose of bonds, debentures, shares of stock, securities, scrip, mortgages, real estate certificates, obligations, contracts and notes issued or created by other corporations, associations, societies or companies, whether public, private, or municipal, or any Corporate body    *    *    *."

"Section 21:    *    *    *    to endorse or otherwise guarantee the payment of the principal of, or interest on, any scrip, bonds, coupons, mortgages, debentures or other securities issued or created by any corporation, joint stock company or association, including so-called Massachusetts Trusts in which this corporation has an interest, or whose shares or securities it owns, to become surety for and to guarantee the

carrying out or the performances of any and all contracts of every kind or character of any corporation, joint stock company or association in which this corporation has an interest, or whose shares or securities it owns, and to do any and all lawful things designed to protect, preserve, improve, or enhance the value of any such shares, scrip, voting trust certificates, bonds, coupons, mortgages, debentures, securities or other evidences of indebtedness of any corporation, joint stock company or association in which this corporation has an interest or whose shares or securities it may own."

But, aside from this, we do not believe under the facts in this case that the defense of *ultra vires* is available to the defendant. As was said by the Court in *Crowder State Bank v. Aetna Powder Co. et al.,* 41 Okl., 394, 138 P., 392, 394, L. R. A., 1917-A, 1021 : "It seems to us that, whether a contract is *ultra vires* or not, if the corporation has permitted its execution and allowed innocent parties to surrender property or other things of value thereunder without objection, and it is impossible to restore their *status quo* and at the same time itself receive and keep the benefits or beneficial effects, it will not then be heard to plead *ultra vires* or lack of authority of one of its principal officers to bind it in that particular respect."

The doctrine followed in most of the State Courts, in direct opposition to the federal rule, is that an action may be maintained on an *ultra vires* contract which has been performed by one of the parties, either by or against a corporation, provided only the contract is founded on a lawful consideration, and to do that which in itself, apart from charter provisions, is lawful to be done. 14A C. J., 583, and note. *White v. Commercial & Farmers' Bank,* 66 S. C., 491, 45 S. E., 94, 101, 97 Am. St. Rep., 803.

In *White v. Commercial & Farmers' Bank, supra,* the following was quoted with approval from *Vought v. Eastern Bldg. Ass'n,* 172 N. Y., 508, 65 N. E., 496, 92 Am. St. Rep., 761 : "We deem it unnecessary at this time to determine

whether the defendant was authorized by that statute to enter into such contracts; for if we assume that the making of them was in excess of the express power conferred upon the corporation by that statute, still, as the contracts involved no moral turpitude, *and did not offend any express statute,* they were *not illegal in a sense that would prevent the maintenance of an action thereon. It is now well settled that a corporation cannot avail itself of the defense of *ultra vires,* when the contract has been in good faith fully performed by the other party, and the corporation has had the benefit of the performance of the contract. As has been said, corporations, like natural persons, have power and capacity to do wrong. They may, in their contracts and dealings, break over the restraints imposed upon them by their charters, and when they do so, their exemption from liability cannot be claimed on the mere ground that they have no attributes or facilities which render it possible for them thus to act. While they have no right to violate their charters, yet they have the capacity to do so, and are bound by their acts where a repudiation of them would result in manifest wrong to innocent parties, and especially where the offender alleges its own wrong to avoid a just responsibility. It may be that, while a contract remains unexecuted upon both sides, a corporation is not estopped to say in its defense that it had not the power to make the contract sought to be enforced; yet, when it becomes executed by the other party, it is estopped from asserting its own wrong, and cannot plead that the contract was beyond its power." (Italics ours.) This language is also quoted with approval in *Eastern Bldg., etc., Ass'n v. Williamson,* 189 U. S., 122, 23 S. Ct., 527, 47 L. Ed., 735. Also see *Porter v. Plymouth Gold Mining Co.,* 29 Mont., 347, 74 P., 938, 101 Am. St. Rep., 569.

By the defendant's own testimony it was brought out that the money paid by the plaintiff and others for this stock was used for the advancement and benefit of the companies belonging to the Central Public Service System, including the

defendant, South Carolina Public Service Company, in Charleston. If the defendant received these benefits—and it is so stated—then it must also bear the burden of the alleged contract to repurchase. The only way to restore the *status quo* of the plaintiff is to repay her the money with which she purchased stock in the Central Public Service Corporation.

There is a conflict in the evidence as to whether John-son was acting on behalf of the defendant, South Carolina Public Service Corporation. Under the facts which we have stated, and to which we have given the most careful consideration, it was for the jury to determine whether or not the acts and conduct of the defendant in connection with the sale of this stock were of such a character as to show that Johnson was its agent and acting with authority to bind it.

The next question involved is, whether the plaintiff should be permitted to vary the written record of the alleged contract which is made up of documents—checks, receipts, etc. —by stating conclusions as to agency and ownership, which contradict this record, and whether the written agreement— stock certificates, receipts, checks, etc.—as made in the record, can be contradicted by parol testimony.

In the instant case there is nothing in the contemporaneous parol agreement in question relating to the repurchase of the stock and the refund of plaintiff's money which conflicts with the written agreement evidenced by the instruments above referred to. In fact, taken together, they constituted the entire contract. We think this is clear. The plaintiff testified upon cross examination by defendant's counsel that Johnson told her that he was representing the defendant and that every time she called him, "I got him through the South Carolina Public Service Corporation, Phone 3974."

We think this, in connection with the other evidence in the record, made an issue for the jury.

During Mr. Shimel's argument to the jury for the ■ plaintiff, this took place:

"Mr. Rivers: Your Honor, I object to that argument; there is no testimony about fraud in this case, and it is entirely unwarranted by the testimony.

"The Court: I don't know about that, Mr. Rivers.

"Mr. Rivers: I wish to note an exception on that; it is not set up in the complaint, and not in the testimony.

"The Court: No, sir; it is not set up in the complaint. Better leave that part out, Mr. Shimel."

Error is assigned because the trial Judge failed to instruct the jury to disregard the argument with reference to fraud, in positive terms, fraud not being an issue in the case. We think this exception is without merit. The jury, in our opinion, could not have failed to understand from the statement made by the Court that fraud was not set up in the complaint, and was not to be considered by them.

Error is assigned because the Court permitted the ■ plaintiff to introduce in evidence a monthly gas bill of the defendant, which it is contended was in no way connected with the transaction under consideration. This gas bill bore upon its face the insignia of the Central Public Service System. We think this testimony was relevant as tending to show the connection between the defendant and the Central Public Service Corporation. It was already in evidence that the defendant was a subsidiary of the Central Public Service Corporation. And for the same reason we overrule Exception 8.

Error is assigned because testimony was admitted, ■ showing that Peirce & Co. had, upon demand, refunded the partial payments for purchase of stock made by the plaintiff, which it is asserted were separate transactions, and in no way connected with the matters in issue, and were prejudicial to the defendant. This testimony was responsive to the allegations of the complaint, and for that

reason was relevant, and constituted a part of the entire transaction.

Error is assigned because the plaintiff was permitted to testify, over defendant's objection, as to a conversation which she alleges she had with a Miss Matthews, an employee of the South Carolina Public Service Company. The plaintiff testified: "I wanted to get somebody else's word for it, for the simple reason that he (Johnson) had said all the employees of the gas company were selling it; so I called up the gas company, after I had bought the stock, and I told them I wanted to ask about the stock they were selling." She said that when she called the defendant company's telephone number, 3974, Miss Matthews answered the telephone and reassured her with reference to the security of the investment, and told her: "He (Johnson) told you right, because you can turn it in any time and get every bit of the money you paid for it."

We see no merit in this exception. If inadmissible, it is certainly not prejudicial. The record is full of testimony of a similar character.

We are of the opinion that the trial Judge committed no error in his refusal to grant a nonsuit, to direct a verdict, or to grant a new trial.

Judgment affirmed.

Mr. Chief Justice Stabler and Messrs. Justices Bonham and Baker concur.

Mr. Justice Carter did not participate on account of illness.