15260

BECKROGE v. SOUTH CAROLINA POWER COMPANY

· (15 S. E. (2d), 124)

(Two cases)

*Mr. Paul M. McMillan, Messrs. Shimmel & Rittenberg and Mr. John I. Cosgrove,* all of Charleston, for appellant,

*Mr. G. L. B. Rivers,* of Charleston, for respondent,

May 12, 1941.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE STUKES.

There are two cases involved in this appeal, F. Addie Beckroge, plaintiff in the one, and Henry L. Beckroge, plaintiff in the other, both against South Carolina Power Company, defendant, and this opinion will be decisive of both actions. They are the aftermath of *Beckroge v. South Carolina Public Service Company*, 185 S. C., 210, 193 S. E., 315. After the decision of the latter-styled cases the plaintiffs in them, also the plaintiffs here, caused executions to be issued upon their judgments against the Public Service Company, which for convenience will be called the gas company, and they were returned *nulla bona* by the sheriff. It develops that the gas company had in 1934, when the actions in which the appeals are reported in 185th S. C. were pending, sold all of its assets to the power company, the defendant here. The secretary and treasurer of the defendant was a witness for it and testified that he had been in the employ of it and its predecessors for over forty-one years, that the power company formerly operated the gas property, from January 1, 1927, until about May, 1929, and also after June 6, 1934, the date

of the deed by the gas company to the power company the latter operated the gas business.

Upon their inability to collect their judgments against the gas company, the plaintiffs brought the instant actions in February, 1938, against the power company alleging in their complaints the judgments against the gas company, the returns *nulla bona* of executions thereon, that the conveyance by the gas company of the latter's assets in 1934 was voluntary, without adequate consideration and fraudulent as to creditors of the gas company and in effect was a consolidation whereby the defendant is continuing the business of the gas company and as such is responsible for the debts of the latter, including plaintiffs' judgments.

Defendant's answer admits its purchase of the property of the gas company, evidenced by deed of June 6, 1934, but denies the other material allegations of the complaint and its alleged liability to the plaintiffs. The gas company was a corporation under the laws of this State, and the record contains no direct evidence of its dissolution; the defendant power company is also a South Carolina corporation. The deed recites as consideration therefor the sum of $1.00 and the assumption by the grantee of the payment of mortgage bonds issued by the gas company in the amount of $1,670,-000.00; in addition it was established in the testimony that the gas company was paid about $11,000.00 cash for appliances on hand and current accounts receivable. In the deed are contained descriptions of the real estate and franchises of the grantor and the following: "All other property and assets, real, personal and or mixed, tangible or intangible, and wheresoever situate, owned by the said grantor, the generality of this language being in no way limited by the specific description above given."

It appears from the record that the power company applied to the South Carolina Public Service Commission in 1934 for approval of its assumption of the bonded debt of the gas company in consummation of its agreed purchase of the assets of the latter, and a hearing was held on June 13,

at which the vice-president and general manager of the defendant power company testified concerning the transaction, as did a valuation engineer and the former general manager of the gas company, the latter having transferred his services to the power company as of the date that the latter assumed operation of the business of the gas company. At this hearing before the Public Service Commission counsel for plaintiffs appeared in their behalf and sought unsuccessfully to have the commission require the assumption by the power company of the gas company's debts to them, but the commission took the view that it was only concerned with whether the assumption of the mortgage bonds was proper and appears to have confined its inquiry to whether the property acquired by the power company was worth at least the amount of the bonds.

General orders of reference to the Master for Charleston County were made of these cases. At the hearing before him the plaintiffs offered in evidence a certified transcript of the testimony taken before the Public Service Commission. Defendant's counsel objected to its admission on the ground that the record was incomplete and also contained things other than testimony, statements of counsel, etc., but in his argument thereabout took the further position that the testimony of the witnesses before the commission was inadmissible in the trial of these actions. However, the Master admitted the transcript as offered and it is in the record in this Court. The trial Judge held that portions of this testimony were admissible and that he would eliminate from his consideration the irrelevant matter. There is no exception to this ruling.

The Master found that the property acquired by the defendant was worth at least $300,000.00 more than the consideration and defendant had knowledge of plaintiffs' claims and that they could not be collected from the gas company, that one of the purposes of the transaction was to prevent, hinder and delay the plaintiffs in such collection, of which the defendant had knowledge, that the business of the gas

company was continued after the acquisition of its assets by the defendant, with the same manager and a number of the same employees, so that the transaction was in effect a consolidation, on which grounds he recommended that judgments should be rendered in favor of the plaintiffs against the defendant. There were numerous exceptions to the Master's report which the Circuit Court heard and after argument reversed the report and rendered judgment for the defendant.

To the latter there are exceptions which the appellants say raise the several questions, first, whether the defendant should have been permitted to introduce testimony before the Master varying the testimony of its officers and agents before the Public Service Commission as to the valuation of the property; second, whether the consideration of the transfer was so inadequate as to render it fraudulent as to the plaintiffs; third, whether the transfer amounted to a consolidation of the two companies; and, last, whether under the facts disclosed by the record the transaction was a fraud on the plaintiffs so as to make the defendant liable for the payment of their judgments against the gas company.

The respondent states a single question, as follows: "Was the sale of the gas company to the South Carolina Power Company made at a time when the gas company was losing money, in consideration of the assumption of the payment of the second mortgage bonds amounting to $1,670,000.00 and $11,000.00 cash for current accounts, in fraud of unsecured creditors of the gas company, and does it give such creditors a right to recover judgment against the purchaser, the power company?"

It will be noted that in this question the indebtedness assumed by the power company is referred to as the "second mortgage bonds" of the gas company. Counsel for appellants objected to this term as not being borne out by the record, but similar reference to the indebtedness is made in the Circuit decree. It was explained at the oral argument before this Court that there was another bond issue upon the property

of the gas company, but it also covered the property of the power company, and when the two companies were dissolved or separated in 1929, *supra,* payment of the other or first mortgage bonds of the gas company was assumed by the power company. It thus appears that for the purpose of the consideration of this controversy the word "second" is superfluous.

Respondent's question assumes, in fact contains the statement, that at the time of the transfer to the power company of its assets the gas company was losing money. The transaction was evidenced by deed of conveyance dated June 6, 1934, made subject, according to the testimony, to the approval of the Public Service Commission, and the last-completed fiscal year of the gas company was the calendar year 1933.

The vice-pesident and general manager of the respondent power company testified before the Public Service Commission that he was an electrical engineer by profession and had familiarized himself with the properties of the gas company and the value of its property and that in his opinion the latter was worth at least $2,000,000.00; that after depreciation and bond interest (six per cent.) for the year 1933, the gas company for the first time showed a deficit, some $16,000.00, which was the worst year the gas company had had, but that he expected the consolidated operation to result in economies, which would turn the red figures into black and that rate adjustments would increase the consumption of gas so that there was no doubt in the mind of the witness that the gas business would be profitable in the hands of the power company which had increased the consumption of electricity per customer by leaps and bounds to the extent that he thought it the highest in the State and that he expected to promote the gas business similarly.

He further testified that the gas company had always earned bond interest with the possible exception of 1933 if its financial statement should be construed that way, whereby

the gas company was not able to set up the full amount of depreciation. Under this testimony of this executive officer of the respondent, it could hardly be accurately found that the gas company was a losing concern. In fact, he summed up his testimony upon the worth of the property as being at least the sum of $300,000.00 more than the debt assumed by his company in consideration of the transfer.

At the hearing before the Public Service Commission, valuation engineer Frank M. Bowen of Ann Arbor, Mich., with twenty years' experience in utilities in practically every state in the union, testified for the power company that the value of the gas properties as of April 1, 1934, was $1,942,-000.00; that he arrived at this figure by study of an inventory by Mr. Spooner of Spooner and Merrill, Chicago, made in August, 1933, to which he applied April 1, 1934, values, and that since April 1st there were further increases in value in some of the items; and that the valuation was very reasonable for it amounted to less than $300.00 per customer. The Spooner and Merrill appraisal as of August, 1933, apparently without depreciation, in other words reproduction cost new, was $1,774,376.00, which the witness said was made at almost the bottom of price levels, both materials and labor.

The testimony at this hearing of the former general manager of the gas company, then in the employ of the power company as manager of the gas properties, since 1918, a gas engineer and an engineering graduate of the University of Pittsburgh, was that the value of the gas properties was at least $2,000,000.00 and that during the years of the ownership by the gas company, since 1929, $380,000.00 had been spent on capital improvements. He further testified that the gas company had made profits over all properly chargeable expenses, a net return after depreciation and bond interest and despite rate reductions of about four to four and one-half per cent. for the last preceding year on an investment of approximately $2,000,000.00, and previously as high as 5.5 per cent.; and he corroborated the valuation engineer upon

the point that in August, 1933, when the inventory and appraisal were made by Spooner and Merrill, values of materials were approximately at their lowest since 1914 and had since advanced from fifteen to thirty per cent.

The Public Service Commission made an order, appearing in the record, by which a majority of the commission approved the assumption by the power company of the bonded indebtedness of the gas company (since paid by the former) and stated their belief that the skill of the power company in operation and management would make the gas properties a source of additional revenue to the power company and would tend to lighten the burden of their consumers of electricity rather than increase it.

At the hearing before the Master the accountant who as assistant treasurer had charge of the accounts of the gas company, although his office was in Roanoke, Va., and he kept the books of seventeen other companies, testified in detail as to the 1933 operations whereby, after depreciation and the payment of the bond interest of $100,200.00, there was a deficit for that year of $14,932.60.

Mr. Spooner was also a witness for the defendant before the Master and testified to his very large experience as a utility valuation engineer, that he and three assistants spent about three weeks in Charleston in July, 1933, after which the work of compilation was done in the Chicago office of his firm which had been engaged to appraise the properties of the gas company, which resulted in a valuation after depreciation of the sum of $1,586,784.00, including working capital of $63,000.00 and "going concern" value of $189,-000.00, and that the figures were the largest possible as they were made for the purpose of rate litigation; and further that he was called upon by Stone and Webster for advice as to the value of the properties as of March 13, 1934, which he arrived at as being, without working capital, $1,568,131-.00 against his comparable August 1, 1933, figure of (deducting therefrom the amount of working capital formerly

included and adding some appreciation) $1,523,784.00, as the result of all of which he advised his employer, Stone and Webster, that the sale of the property for $1,670,000.00 would be upon the fair market value and, in fact, he advised the sale at that figure having in mind the maturity of the bonds in 1936 and the isolated location of the property; that, however, it could be operated more economically by the power company both in overhead expense and in material purchases. This testimony was further qualified by admission that there might be considerable changes in the valuation between March and June, 1934, and at that time there was not a ready market for public utility property. The witness further testified that he has known Frank M. Bowen for many years and he has a reputation as a competent utility engineer. The plaintiffs objected to Mr. Spooner's testimony and moved at its conclusion to strike it out as improper for it tended to contradict the testimony offered by the defendant before the Public Service Commission whereby the transfer of the properties was made.

The effectiveness of a sale of all of its assets, or substantially all, by a corporation to defeat the claims of creditors, is not to be tested by the rules of law applicable to conveyances by individuals. Nowhere have we found this more clearly expressed than by the Kentucky Court of Appeals in *American Ry. Exp. Co. v. Kentucky*, 190 Ky., 636, 228 S. W., 433, 441, 30 A. L. R., 543, which decision was expressly approved by this Court in *Terry Packing Co. v. Southern Express Co. et al., infra*; it was there said by the Court: "The substantial difference between a corporation and an individual, so far as the sale of all its or his property is concerned, is that the corporation is a creature of the law. There is no personal liability. All it has for the payment of its debts is its property and assets, and the law, for the protection of creditors, has impressed this property with a trust character for the payment of the debts, and said that the corporation holds it for the benefit of its

creditors, and when it parts with this property, getting in return nothing the creditor can subject, the law will follow the property into the hands of the taker and make it liable to the extent of the value of the property received."

The Supreme Court of the United States upheld a similar decision, without opinion, of the Kentucky Court in *American Ry. Exp. Co. v. Kentucky*, 273 U. S., 269, 47 S. Ct., 353, 71 L. Ed., 639.

It is interesting to note that this rule was recognized and applied by this Court in *Ex parte Savings Bank of Rock Hill (In re White v. Commercial & Farmers Bank)*, 73 S. C., 393, 53 S. E., 614, and the decision was made the subject of an annotation in 5 L. R. A. (N. S.), 520. In that case there was an agreement on the part of the transferee to pay the debts of the transferrer, so to that extent the facts are unlike those in the instant case, and it may be said that it is not a controlling authority here. Nevertheless the Court expressly recognized the rule that until the assets of a corporation have passed into the hands of *bona fide* creditors or purchasers for value, as long as any debts of the corporation are unpaid, the holders of the assets take them charged with a trust in favor of the creditors. Careful reading of the decision leads to the conclusion that the Court would have reached the same result had there been no promise by the transferee to pay the debts; and, in fact, the latter corporation had become insolvent and the question arose in the distribution of the assets so the promise was unimportant.

Other annotations upon the subject, containing conflicting authorities, will be found in 11 L. R. A. (N. S.), 1119, 32 L. R. A. (N. S.), 616, 15 A. L. R., 1112, 30 A. L. R., 558, and 39 A. L. R., 143. From that in 15 A. L. R., the following appropriate language is taken: "The transfer of the assets of one corporation to another may amount to a merger in fact, although the corporate existence of the transferrer corporation continues. Where such

is the case, equity looks past the form, and at the real effect of the transaction, and by an application of the trust fund doctrine holds the transferee liable to the extent of the assets received, as in such case it is not a *bona fide* purchaser for value."

In the consideration of this question the able trial Judge expressed himself as being bound by the decision of *Brown v. American Ry. Exp. Co.,* 128 S. C., 428, 123 S. E., 97, where that case was remanded for a new trial. After it came the case of *Terry Packing Co. v. Southern Exp. Co. et al.,* 143 S. C., 1, 141 S. E., 144, referred to above, wherein the identical defendant as in the *Brown case* was held liable upon similar facts. It is significantly indicated in the opinion of this Court in *Huggins v. Commercial & Savings Bank,* 141 S. C., 480, 140 S. E., 177, that the decision in the *Brown case* had been modified by that in the *Terry case.*

In the decision of the latter, the able Justice Cothran filed a dissent in which he clearly recognized the rule adverted to and said by way of concession to the majority of the Court, thus putting all in agreement upon the point: "The decision in the *Brown case* * * * should not be extended to all cases of a purchase by one corporation of the assets of another. I agree to the general proposition * * * that a corporation which purchases the business and assets of another which has sufficient tangible assets in the state to pay its debts, by merely issuing its capital stock to the selling corporation, leaving it no property within the state which can be subjected to the payment of its debts, is bound to satisfy such debts; it becomes a trustee for the creditors of the selling corporation to the extent of the assets so purchased. The decision in the *Brown case* should therefore be so limited by the circumstances of that case as not to impair this statement of the general rule." (143 S. C., 1, 141 S. E., 152.)

Acting Associate Justice Purdy likewise said in his dissent (upon another ground) that he did not want to be un-

derstood as desiring to depart "from the principles announced by this court in holding a corporation purchasing the assets of another corporation liable for the claims against that corporation, as is so forcibly expressed * * * in *Brabham v.* [*Southern*] *Express Co.,* 124 S. C., 157, 117 S. E., 368."

It can hardly be said that the purchaser should escape ■ liability, or rather the property escape, solely because the stockholders of the selling corporation receive nothing from the transaction, as is indicated by the record was the case here. It is, of course, well settled that creditors' rights are superior to those of shareholders. That the latter receive nothing is not reason or argument that the creditors must be left in like plight.

If the *Brown case* were our only and unimpeached authority on the subject, it would not be controlling of this case. It is necessary only to point out that it was heavily rested upon the evidence that the selling corporation retained its corporate existence and officers and property consisting of real estate, stocks and bonds. Study of the opinion causes the belief that the able author, former Justice Marion, would have come to a contrary conclusion upon the facts here presented.

Under the latter, the facts of this case, rather fully ■ adverted to above, we are constrained to hold that the gas properties in the hands of the defendant power company may be subjected to the payment of the judgments procured against the gas company in the actions pending at the time of the transfer of the properties. The defendant, the purchaser, had full notice of the claims at that time. In fact, it appears from the testimony of its general manager at the hearing before the Public Service Commission that he was not certain that these contingent liabilities were not provided for in the transaction; even after his counsel had prompted him to the effect that they were not, he testified that he did not think so, but he was not sure.

In the view we take it is not necessary to determine appellants' first question, whether it was error to admit the testimony varying that of the officers and agents of the power company before the commission concerning the value of the property, for consideration of all of the testimony, including that first taken before the commission and that offered by respondent at the reference in this action, compels the conclusion that the property transferred was worth substantially more than the bonded debt assumed, the consideration. To hold otherwise would require refusal to·credit the testimony of the respondent's own general manager, referred to above, that the worth was $2,000,000.00; and the valuation expert there produced testified to approximately the same figure. From respondent's brief it appears that the general manager, then vice-president of the company, has since been promoted to the office of president and by that source it is also shown that his optimism as to the increased earnings of the former gas company was well founded and has materialized since the gas properties again came into the hands of his company.

Question is not made in this appeal as to the form of the action, which possibly should have been to subject the property to the payment of the uncollected judgments against the gas company. The Master recommended money judgments against the respondent; they total approximately $4,-000.00 exclusive of interest and costs, so the amount is very small in comparison with the value of the property, particularly since the latter has been freed from the lien of the bonds which were paid by the respondent upon the maturity of them in 1936.

Accordingly, it is the judgment of this Court that the judgment of the Circuit Court be reversed and the cases remanded thereto for the entry of judgments in favor of the appellants and against the respondent in accord with the recommendations of the Master.

Mr. Chief Justice Bonham, Messrs. Justices Baker and Fishburne and Mr. Acting Associate Justice T. S. Sease concur.